Community Health Care Association of New York v. Shah

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2013

(Argued: June 3, 2014                              Decided: October 7, 2014)

Docket Nos. 13-771-cv; 13-991-cv; 13-3332-cv; 13-3454-cv

_____

COMMUNITY HEALTH CARE ASSOCIATION OF NEW YORK, ANTHONY L. JORDAN HEALTH CENTER, BEDFORD STUYVESANT FAMILY HEALTH CENTER, INC., BROOKLYN PLAZA MEDICAL CENTER, INC., BROWNSVILLE MULTI-SERVICE FAMILY HEALTH CENTER, CHARLES B. WANG COMMUNITY HEALTH CENTER, INC., COMMUNITY HEALTH CENTER OF BUFFALO, INC., COMMUNITY HEALTH CENTER OF RICHMOND, INC., COMMUNITY HEALTHCARE NETWORK, DAMIAN FAMILY CARE CENTERS, INC., EAST HARLEM COUNCIL FOR HUMAN SERVICES, INC., EAST HILL FAMILY MEDICAL, INC., EZRA MEDICAL CENTER, FAMILY HEALTH NETWORK OF CENTRAL NEW YORK, INC., FINGER LAKES MIGRANT HEALTH CARE PROJECT, INC., HERITAGE HEALTH AND HOUSING, INC., HUDSON HEADWATERS HEALTH NETWORK, HUDSON RIVER HEALTHCARE, INC., JOSEPH P. ADDABBO FAMILY HEALTH CENTER, INC., MIDDLETON COMMUNITY HEALTH CENTER, INC., MORRIS HEIGHTS HEALTH CENTER, MOUNT VERNON NEIGHBORHOOD HEALTH CENTER, INC., NORTHERN OSWEGO COUNTY HEALTH SERVICES, INC., NORTHWEST BUFFALO COMMUNITY HEALTH CARE CENTER, OAK ORCHARD COMMUNITY HEALTH CENTER, INC., ODA PRIMARY HEALTH CARE CENTER, INC., OPEN DOOR FAMILY MEDICAL CENTER, INC., ROCHESTER PRIMARY CARE NETWORK, RYAN/CHELSEA-CLINTON COMMUNITY HEALTH CENTER,

SCHENECTADY FAMILY HEALTH SERVICES, INC., DBA HOMETOWN HEALTH CENTER, SUNSET PARK HEALTH COUNCIL, INC., SYRACUSE COMMUNITY HEALTH CENTER, INC., GREATER HUDSON VALLEY FAMILY HEALTH CENTER, INC., URBAN HEALTH PLAN, INCORPORATED, WHITNEY M. YOUNG, JR. HEALTH CENTER, WILLIAM F. RYAN COMMUNITY HEALTH CENTER,

*Plaintiffs--Appellants--Cross-Appellees,*

v.

M.D. NIRAV SHAH, in his Official Capacity as Commissioner, New York State Department of Health, State of New York,

*Defendant--Appellee--Cross-Appellant.*

_____

Before: POOLER, HALL, and CARNEY, *Circuit Judges*.

Appeal from the United States District Court for the Southern District of New York (Andrew L. Carter, Jr., *J.*). Plaintiffs, certain health-service providers designated under federal law as Federally Qualified Health Centers ("FQHCs", or "Health Centers") and a trade association representing a number of FQHCs assert various challenges under 42 U.S.C. § 1983 to New York's methods of reimbursing them for services they provide under Medicaid. They seek injunctive relief to remedy these supposed shortcomings in New York's method for providing Medicaid reimbursement for their provision of services under 42

U.S.C. § 1396a(bb). The Health Centers' suit, at present, names M.D. Nirav Shah, Commissioner of the New York State Department of Health ("Commissioner"), as defendant. On cross-motions for summary judgment, the district court for the most part upheld the Commissioner's methods for reimbursing FQHCs for services they provide pursuant to Medicaid, and granted prospective relief to the Health Centers for reimbursement for certain services they provide to patients enrolled with Medicaid Managed Care Organizations ("MCOs"). *Cmty. Healthcare Ass'n of N.Y. v. N.Y. State Dep't of Health*, 921 F. Supp. 2d 130 (S.D.N.Y. 2013).

We agree with the district court that, by and large, there are no disputed issues of material fact, and that summary judgment is therefore appropriate. *See* Fed. R. Civ. P. 56(a). We further agree with the district court's approach to, and analysis of, the majority of the issues before us. We thus affirm the grant of summary judgment to the Commissioner on most issues involving his methodologies for reimbursing FQHCs, and affirm the grant of summary judgment to the FQHCs on issues involving their reimbursement for services provided to MCO enrollees. However, we find that the district court erred in concluding that there were no disputed issues of material fact with respect to the Commissioner's methodology for calculating its prospective obligation to make a

3

wraparound payment to FQHCs that provide services pursuant to a contract with an MCO, *see* 42 U.S.C. § 1396a(bb)(5). We therefore vacate in limited part the district court's grant of summary judgment to the Commissioner and remand for the district court to assess, after resolution of these factual disputes, the compatibility of this methodology with 42 U.S.C. § 1396a(bb)(5).

Affirmed in part, vacated and remanded in part.

_____

MATTHEW S. FREEDUS, Feldesman Tucker Leifer Fidell LLP, Washington D.C. (James L. Feldesman, Feldesman, Tucker Leifer Fidell LLP, Washington D.C.; David A. Koenigsberg, Mens Bonner Komar & Koenigsberg LLP, New York, NY, *on the brief*), *for Plaintiffs--Appellants--Cross--Appellees*.

ANDREW W. AMEND, Assistant Solicitor General of Counsel (Eric T. Schneiderman, Attorney General of the State of New York; Barbara D. Underwood, Solicitor General; Richard P. Dearing, Deputy Solicitor General, *on the brief*), New York State Office of the Attorney General, New York, NY, *for Defendant--Appellee--Cross-Appellant*.

POOLER, *Circuit Judge*:

This case requires us to consider challenges to certain aspects of New York's administration of its responsibilities under the federal Medicaid Act, 42

4

U.S.C. § 1396a *et seq.* ("Medicaid Act" or "Medicaid Statute"). Plaintiffs, certain health-service providers designated under federal law as Federally Qualified Health Centers and a trade association representing a number of FQHCs (together, "FQHCs" or "Health Centers") assert various challenges to New York's methods of reimbursing them for services they provide under Medicaid. They seek injunctive relief under 42 U.S.C. § 1983 to remedy these alleged shortcomings in New York's method for providing Medicaid payments for the services the Health Centers provide. The Health Centers' suit, at present, names M.D. Nirav Shah, Commissioner of the New York State Department of Health, ("Commissioner") as defendant.[1] On cross-motions for summary judgment, the United States District Court for the Southern District of New York (Andrew L. Carter, Jr., *J.*), for the most part upheld the Commissioner's methods for reimbursing FQHCs for services they provide pursuant to Medicaid, but granted prospective relief to the Health Centers for reimbursement for certain services they provide to patients enrolled with Medicaid Managed Care Organizations

---

[1] As the district court noted, the Health Centers' initial suit named Richard F. Daines as defendant, as he was then Commissioner, and Shah took his place shortly after. We will maintain the district court's practice of referring to the defendant simply as the Commissioner. *Cmty. Healthcare Ass'n of New York v. New York State Dep't of Health*, 921 F. Supp. 2d 130, 132–33 n.1 (S.D.N.Y. 2013).

("MCOs"). *Cmty. Healthcare Ass'n of New York v. New York State Dep't of Health*, 921 F. Supp. 2d 130 (S.D.N.Y. 2013).

We agree with the district court that, as to the questions presented on appeal—with only one exception—there are no disputed issues of material fact, and that summary judgment was therefore appropriate. *See* Fed. R. Civ. P. 56(a). We further agree with the district court's approach to, and analysis of, the majority of the issues before us. We thus affirm the grant of summary judgment to the Commissioner on most issues involving his methodologies for reimbursing FQHCs, and affirm the grant of summary judgment to the FQHCs on issues involving their reimbursement for services provided to MCO enrollees. However, we find that the district court erred in concluding that there were no disputed issues of material fact with respect to the Commissioner's methodology for calculating its prospective obligation to make a wraparound payment to FQHCs that provide services pursuant to a contract with an MCO, *see* 42 U.S.C. § 1396a(bb)(5). We therefore vacate in limited part the district court's grant of summary judgment to the Commissioner and remand for the district court, after resolution of these factual disputes, the compatibility of this methodology with 42 U.S.C. § 1396a(bb)(5).

Affirmed in part, vacated and remanded in part.

## BACKGROUND

We are concerned here with two competing objectives: "the mission of publicly-funded health clinics to provide a panoply of medical services to under-served communities, on the one hand," *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1009 (9th Cir. 2013), and the necessity that there be a "measure of discretion [states have] in choosing how to expend Medicaid funds," *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002), on the other. This measure of discretion, in turn, is premised on the recognition that states receiving Medicaid funds must be permitted to develop Medicaid programs that are responsive to the needs of their respective communities, so long as these programs are consistent with federal Medicaid requirements, a statutory arrangement that the Supreme Court has recognized as "designed to advance cooperative federalism." *Wis. Dep't of Health and Family Svcs. v. Blumer*, 534 U.S. 473, 497 (2002). This cooperative arrangement is of a piece with what has long been recognized as "one of the happy incidents of the federal system," namely, "that a single courageous state may . . . serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 386–87 (1932) (Brandeis, *J.*, dissenting). New York, as the administrator of the country's largest and most expensive Medicaid

program—with an annual budget exceeding $50 billion dollars—is currently engaged in such an experiment. In this pursuit, it has attempted to balance: the needs of low-income patients served by Medicaid and other federal programs; the missions, goals, and constituencies of health-care providers, in particular the community health centers who are plaintiffs in this case; and the possibility of achieving both cost-savings and better health outcomes that can result from contracting with MCOs to provide Medicaid services. With limited reservations, we conclude that federal law permits New York to pursue the path it has chosen.

**I.      Federally Qualified Health Centers as Medicaid Service Providers**

The federal government established the Medicaid program via the passage, in 1965, of Title XIX of the Social Security Act, now codified at 42 U.S.C. § 1396 *et seq*. Medicaid is one of two programs, along with Medicare, through which the United States "subsidizes heath care for persons" other than federal employees. *Wilson-Coker*, 311 F.3d at 133. Unlike Medicare, which primarily services the elderly and the disabled and depends on "intermediaries[] who must apply a uniform set of standards established by federal law . . . Medicaid . . . is designed to partially compensate States for the costs of providing health care to needy persons of modest income." *Id.* at 134 (internal citations omitted). Thus, "States need not participate in the program, but if they choose to do so, they must

8

implement and operate Medicaid programs that comply with detailed federally mandated standards." *Three Lower Cnties. Comm. Health Svcs., Inc. v. Maryland*, 498 F.3d 294, 297 (4th Cir. 2007) (internal quotation marks omitted).

The Secretary of the Department of Health and Human Services ("HHS") is responsible for overseeing state compliance with federal standards for implementing Medicaid programs. *N.J. Primary Care Ass'n, Inc. v. N.J. Dep't of Human Svcs.*, 722 F.3d 527, 529 (3rd Cir. 2013). Within HHS, the Centers for Medicaid and Medicare Services ("CMS") is responsible for exercising the "delegated authority" to oversee state compliance with federal Medicaid requirements. *Sai Kwan Wong v. Doar*, 571 F.3d 247, 250 (2d Cir. 2009) ("Congress has entrusted the Secretary of HHS with administering Medicaid, and the Secretary, in turn, exercises that delegated authority through the CMS."). To determine state eligibility for Medicaid funds, the state "must submit a plan detailing how the State will expend its funds." *Wilson-Coker*, 311 F.3d at 134. As relevant here, "[o]ne federal requirement is that a state Medicaid plan provide payment for services rendered by [FQHCs]." *Three Lower Cnties.*, 498 F.3d at 297.

The FQHC designation is also a creature of federal law. As Medicaid was designed to ensure medical services for "needy persons of modest income," *Wilson-Coker*, 311 F.3d at 134, so also we have explained that FQHC grants were

9

similarly designed to ensure access to health services for "medically underserved communities." *Id.* at 134 n.2. The constituencies served by Medicaid and by FQHCs are not identical, however. "An FQHC is an entity receiving direct grants from the United States to provide primary and other health care services to [these underserved communities]. In addition to receiving direct grants, an FQHC can also bill for providing Medicare or Medicaid services. This dual funding mechanism allows the FQHC to allocate most of its direct grant dollars towards treating those who lack even Medicare or Medicaid coverage." *Id.* (internal citations omitted); *see also Three Lower Cnties.*, 498 F.3d at 297 ("[Plaintiff] is therefore not only a 'health center' receiving funds under the Public Health Service Act but also, by definition, an FQHC receiving funds under the federal Medicaid program.").

From the creation of dual funding sources for FQHCs, in the form of direct federal grants and indirect federal Medicaid dollars filtered through the states, FQHCs faced regulatory problems that, at least in part, compromised their mission to treat a constituency of "those who lack even . . . Medicaid coverage." *Wilson-Coker*, 311 F.3d at 134 n.2. The federal grant program for FQHCs was established in 1975, as Section 330 of the Public Health Services Act. *See* Special Health Revenue Sharing Act of 1975, Pub. L. 94-63, § 501, 89 Stat. 304, now

10

codified at 42 U.S.C. § 254b. At the outset, the Ford Administration objected to the program as one which would provide services that duplicate those reimbursable under Medicare and Medicaid. S. Rep. 94-29, at 5--6, *reprinted in* 1975 U.S.C.C.A.N. 469, 472--73. Because of the overlapping mandate for Health Centers, and the various statutory gaps that allowed for states to avoid full payment to FQHCs for their service to Medicaid patients, the result for FQHCs by 1989, was that

> on average, Medicaid payment levels to [FQHCs] cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients. The role of the programs funded under section[] . . . 330 . . . is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay. To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.

H.R. Rep. No. 101-247, 392, *reprinted in* 1989 U.S.C.C.A.N. 1906, 2118. Congress remedied this problem by legislating in 1989 that states receiving funds under Medicaid would be required "to reimburse FQHCs for '100 percent . . . of [each FQHC's] costs which are reasonable.'" *Three Lower Cnties.*, 498 F.3d at 297 (alterations and omission in original) (quoting 42 U.S.C.§ 1396a(a)(13)(C) (repealed 2000)). "Congress' purpose in passing this . . . requirement was to ensure that health centers receiving funds under § 330 . . . would not have to

11

divert Public Health Services Act funds to cover the cost of serving Medicaid patients." *Id.*

The statutory scheme of reimbursement to FQHCs for services for which they were entitled to reimbursement under Medicaid was changed again in 2000. "To relieve health centers from having to supply new cost data every year, Congress amended the Medicaid Act in 2000 to implement a new *prospective* payment system based on historical costs plus a cost-of-living factor." *Id.* at 298 (emphasis in original). This is the system at issue in this case.

In pertinent part, the current statutory scheme requires that "the State plan shall provide for payment [to FQHCs] for such services in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs for the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the costs of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes . . . ." 42 U.S.C. § 1396a(bb)(2). "This rate-setting mechanism is known as the Prospective Payment System ("PPS")." *N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 529. The rate for repayment is also indexed to keep pace with cost of living increases. 42 U.S.C. § 1396a(bb)(3); *see also Three Lower Cnties.*, 498 F.3d at 298.

"The system of states reimbursing FQHCs for their Medicaid costs is complicated considerably by the fact that many states . . . use a managed care approach to running their Medicaid system." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 62 (1st Cir. 2005). The use of managed care, according to the Commissioner, "has become increasingly prominent in the Medicaid system nationwide." The majority of Medicaid patients treated by FQHCs in New York are in fact enrolled by an MCO. Under this system generally, the state does not directly reimburse health service providers that serve Medicaid recipients. Rather, the state enters into a contract with an MCO. The state then pays the MCO for each Medicaid patient enrolled with it. The MCO, in turn, contracts with a health service provider, such as an FQHC, to provide medical services to its enrollees. *See generally Rio Grande Cmty. Health Ctr.*, 397 F.3d at 62. The Commissioner submits that the benefits of such arrangements include "costs savings" that result "from an emphasis on preventive and primary care, as opposed to emergency care, historically a principal means by which underserved populations have accessed medical treatment."

The Health Centers, for their part, explain how federal law was designed to encourage MCOs to contract with FQHCs for provision of Medicaid services to MCO enrollees. Prior to the 1997 Balanced Budget Amendment ("BBA"), Pub. L.

13

No. 105-33, 111 Stat. 251, formerly codified at 42 U.S.C. § 1396a(13)(c)(1999), MCOS were required by the Medicaid Act to reimburse FQHCs "the full amount of the 100 percent reasonable cost" of providing services. *See generally N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 540–41. The current arrangement, however, adopted in 1997 and now codified, with little amendment, at Section 1396a(bb)(5)(A), places the obligation on states to reimburse FQHCs as follows: "In the case of services furnished by a[n] [FQHC] . . . pursuant to a contract between the center . . . and a[n] [MCO] . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the [PPS] amount . . . exceeds the amount of the payments provided under the contract." In short, if an FQHC contracts with an MCO, and under this contractual arrangement an MCO pays the FQHC for services at a rate that is less than the PPS rate, the FQHC must still be made whole by the state. Furthermore, these "wraparound" payments are to be distributed to FQHCs "in no case less frequently than every 4 months." *Id.* § 1396a(bb)(5)(B).

The payment method for reimbursing FQHCs for services which they provide pursuant to Medicaid may also be established by an "alternative payment methodology." *Id.* § 1396a(bb)(6). This methodology may be used only

if it "is agreed to by the State and the [FQHC] and . . . results in a payment to the [FQHC] which is at least equal to the amount otherwise required to be paid . . . under this section." *Id.*

**II.     Methodologies for FQHC Reimbursement in New York**

The New York State Department of Health ("DOH") is the New York entity responsible for administering New York's Medicaid program. In addition to ensuring New York's Medicaid compliance with state law, the DOH must also ensure New York's compliance with federal laws and regulations. After the passage of 42 U.S.C. § 1396a(bb), New York passed corresponding state legislation to meet its obligations to pay FQHCs at a PPS rate. *See* N.Y. Pub. Health L. § 2807(8). Because the passage of Section 1396a(bb) also worked a substantive change in the administration of state Medicaid programs, the DOH was also responsible for submitting to CMS a State Plan Amendment ("SPA") indicating how it would comply with the new method of prospectively reimbursing FQHCs for providing Medicaid services. *See* 42 C.F.R. § 430.12(c). Section 1396a(bb) was scheduled to be implemented for "services furnished on or after January 1, 2001," 42 U.S.C. § 1396a(bb)(1). The DOH spent 2001 first reviewing various billing practices of FQHCs during 1999 and 2000, and then submitting various iterations of its SPA, SPA 01-03, proposing a PPS

15

methodology to CMS, in an effort to acquire approval. SPA 01-03 was approved by CMS in April 2002. DOH also later submitted an additional proposed SPA, SPA 06-11, to CMS proposing changes as to how FQHCs would be reimbursed for providing certain offsite and group psychotherapy services, which was approved by CMS in 2006.

Since the passage of Section 1396a(bb), New York has also made certain other changes or updates to the ways in which FQHCs are to be compensated for providing Medicaid services. In 2004, DOH issued guidance to FQHCs, among other Medicaid service providers, in one of its periodic "Medicaid Updates" ("Medicaid Update", or "2004 Update") urging that non-emergency dentist visits should include both a cleaning and an exam as part of the same visit. The 2004 Update was issued because certain Medicaid service providers were performing cleanings and examinations on separate visits, increasing the number of visits for which it was possible to bill Medicaid. Finally, DOH has also implemented various policies to satisfy its obligation to pay FQHCs a statutorily guaranteed wraparound rate if the FQHC contracts with an MCO. 42 U.S.C. § 1396a(bb)(5). Neither the dental billing update nor the calculation of New York's prospective wraparound obligation was ever approved by CMS. These policies also have never been promulgated officially as New York regulations.

16

## A. CMS-Approved Methodologies

Two of the payment methodologies challenged here, New York's general PPS rate and its PPS rate for certain offsite services provided by FQHCs, have been specifically approved by CMS pursuant to its authority to review amendments to state plans. 42 C.F.R. § 430.12.

### 1. New York's PPS Rate

Both parties are in agreement on the content of New York's PPS rate. As the district court explained:

> In New York, the PPS rate for reimbursement to FQHCs is the lower of allowable costs, as defined by state regulations, or the applicable peer group ceiling. [DOH] first considers each FQHCs patient care costs ("allowable costs") from two base years. DOH then classifies allowable costs as either capital or operating costs and further classifies the operating costs into six categories [including administrative, patient transportation, medical, dental, and therapy, and ancillaries]. The six categories of operating costs are divided by the total number of patient visits to the FQHC, yielding the FQHC's average per-visit costs. The average per-visit costs are compared to ceilings, based on the operating costs of other diagnostic and treatment centers, including non-FQHCs, located in the same region (upstate rural, upstate urban and downstate). The ceiling is 105% of the peer group's average costs, by service category.

*Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 134.

17

**2. New York's Rate for Offsite and Group Psychotherapy Services**

CMS has also approved a specific New York PPS rate for certain services that FQHCs provide offsite. Again, the district court ably summarized the content of this rate in proceedings below, and the parties do not dispute it.

> CMS approved reimbursement of group therapy and offsite services performed by FQHCs at special rates, lower than the full PPS rates[] . . . CMS permitted rates of payment for group psychotherapy and offsite services to be calculated using elements of the CMS-promulgated Resource Based Relative Value Scale. Furthermore, CMS required Medicaid reimbursement for offsite services only if provided to existing patients of the FQHC and where the offsite services were necessitated by health or medical reasons.

*Id.*

**B. 2004 Medicaid Update Regarding Provision of Dental Services**

The DOH periodically issues "Medicaid Updates." These updates "address, among other things, guidelines and policies for Medicaid billings and payments." App'x at 460–61. In the 2004 Update the DOH advised clinics as follows.

> Non-emergency initial visits should include a cleaning, x-rays (if required), and a dental exam with a definitive treatment plan. *Generally, this should be accomplished in one visit*. However, in rare instances, a second visit may be needed for completion of these services. We would expect a notation in the record to indicate the reason for a second visit.

18

App'x at 471 (emphasis in original).

The concept of a "visit" is central to managing Medicaid costs. As the Commissioner explains, basing Medicaid reimbursement to centers on visits rather than discrete services "reflects a policy that the services provided in a visit to a clinic should be determined by the medical needs and circumstances of a patient, rather than the clinic's desire to maximize reimbursement."

The parties here disagree as to whether DOH's 2004 Update worked a change in billing practices by FQHCs with respect to reimbursement under Medicaid for the provision of dental services. Plaintiffs assert that "[w]hen PPS rates were calculated for plaintiff health centers, using the center's 1999 and 2000 reasonable costs, the health centers were then providing dental examinations and cleanings during separate visits." The result, according to the Health Centers, is that "the State's consolidation requirement . . . has an effect that violates the federal law governing the manner in which an FQHC must be reimbursed by the Medicaid program (§ 1396a(bb)). That is, it changes what was in fact two visits (in the base years) to one visit without an adjustment to the affected FQHC's per visit rate (to account for the resulting higher cost per visit)."

The Commissioner disputes the evidentiary basis for the Health Centers' claim that scheduling cleanings and examinations on separate visits was common

19

practice in 1999 and 2000. Additionally, the Commissioner claims that "[t]he guidance did not represent any change in policy; it merely made clear that any FQHCs that were scheduling separate visits for . . . the related services of dental cleanings and examinations [were doing so] contrary to longstanding DOH regulations."

### C. New York's Methodology for Determining the Wraparound Rate in the Case of FQHC and MCO Contracting

#### 1. Prospective Calculation of the Wraparound Rate

Section 1396a(bb)(5) also includes specific requirements for the states to provide supplementary, or "wraparound," payments to FQHCs in the event that the FQHCs provide services pursuant to a contract with an MCO. New York has never received specific approval from CMS for any iteration of its methodology, past or present, for calculating the wraparound payments that are owed to FQHCs. As the district court explained, the final SPA submitted to CMS included terminology with respect to the supplemental payment obligation "that . . . largely mimics the text of 42 U.S.C. § 1396a(bb)(5) . . . . CMS did not approve a special methodology for supplemental payments." *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 141-42. The Commissioner does not argue on appeal that

its current methodology for calculating the supplemental payment is entitled to the same deference due one approved by CMS.

The current wraparound payment methodology employed by New York is prospective. As the district court explained, the methodology for calculating the Supplemental Payment is laid out in the "NYS Managed Care Supplemental Payment Program for FQHCs Policy Document" ("Supplemental Payment Program"). *Id.* at 134. This supplemental payment "is the average difference between what that FQHC is paid by contracted MCOs and its specific blended medicaid rate for each year." App'x at 629--30. That rate "is a weighted average of the center's PPS rate, offsite service rate, and group counseling rate." *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 135.

The Health Centers object to the use of this rate on two grounds. The first objection is that, because Section 1396a(bb)(5) requires that the wraparound payment be "equal to" the difference between the amount paid, for each visit, to the FQHC by the MCO and the amount owed the FQHC under the PPS rate, New York cannot merely estimate its prospective wraparound payment using the previous years' MCO visits and payments. Such estimates, the plaintiffs contend, cannot satisfy the statutory meaning of "equal to" as it is used in Section 1396a(bb)(5).

The second objection is to how New York collects the information it uses to calculate the wraparound rate. The FQHCs submit to DOH a Managed Care Visit and Revenue Report ("MCVR Report"), which documents the previous year's MCO visits and repayments. The FQHCs allege that the MCVR Report does not allow the FQHC to report a visit during which the FQHC provided services for which the MCO did not reimburse the FQHC. Thus, there is no provision for an FQHC to report certain visits to the DOH such that they might be included in the calculation of the prospective year's wraparound rate. The Health Centers allege that this reporting gap results in systematic underpayment to the FQHCs. The Commissioner, for his part, submits that FQHCs can put in a claim for a supplemental payment even if the MCO has not reimbursed the FQHC at the time the supplemental payment request is made.

**2. MCO Non-Payment and Administrative Challenges**

The inability of FQHCs to report to DOH on visits which did not result in MCO payment for the purposes of New York's wraparound rate calculus is also related to two independent challenges by the Health Centers with respect to New York's obligations under Section 1396a(bb)(5). The Health Centers argue that New York fails to provide any avenues by which the Health Centers can challenge an MCO for non-payment for services. The result is that not only is

22

New York's prospective calculation of the supplemental payment short, but also that the service provided by the FQHC will not qualify as a service provided "pursuant to a contract" with an MCO, and thus not qualify for a supplemental payment under Section 1396a(bb)(5). The FQHCs argue they are left footing the entirety of the bill for services which they provided.

The Health Centers bring a final challenge under Section 1396a(bb). They argue that there is no provision for payment to FQHCs in the event that the Centers provide services to an MCO enrollee that is outside of the network of the MCOs. The Commissioner argues that New York's contracts with MCOs place this payment burden on MCOs, and thus MCOs are obligated to pay for these services. The Commissioner argues that Congress has made this option available to it under 42 U.S.C. § 1396b(m), which provides in relevant part

> that, in the case of medically necessary services which were provided (I) to an individual enrolled with the entity under the contract and entitled to benefits with respect to such services under the State's plan and (II) other than through the organization because the services were immediately required due to an unforeseen illness, injury, or condition, either the entity or the State provides for reimbursement with respect to those services.

42 U.S.C. § 1396b(m)(2)(A)(vii). The Commissioner argues that this provision of the Medicaid Act governing state-MCO contracting trumps the provisions of the

Medicaid Act requiring full reimbursement to FQHCs for the services they provide, as mandated by Section 1396a(bb).

III.    **Proceedings Below**

    A.    **Summary Judgment**

After discovery, both parties cross-moved for summary judgment. The district court, in a thorough and cogent opinion, granted partial summary judgment and denied partial summary judgment to both parties. In addressing the FQHCs' challenge to New York's PPS methodology, the district court determined that "[s]ince the statute is ambiguous, the starting place is . . . whether the federal agency has approved a permissible construction of the Medicaid Act." *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 139. With respect to the Health Centers' challenge to New York's use of peer group ceilings, the district court noted that CMS had specifically asked the Commissioner to justify such an approach, and that the Commissioner had "responded that CMS had previously approved the use of peer group ceilings." *Id.* It noted that "CMS addressed all of the concerns that Plaintiffs now try to argue merit dismissal of the peer group ceilings . . . and still approved the SPA." *Id.* Thus, the district court concluded that "the interpretation of the statute to allow peer group

ceilings . . . is, at the very least, a plausible one." *Id.* It granted summary judgment to the Commissioner on this issue.

With respect to the Health Centers' challenge to the reimbursement for offsite and group therapy services, the district court again noted that "Congress's intent about how offsite services and group therapy should be reimbursed is not explicitly set forth in the Medicaid statute," and thus reasoned that it would "grant deference to CMS's approval of" SPA 06-11 "setting reimbursement rates for these services. *Id.* at 140. It concluded that "the prior approval of CMS yielded a permissible construction that offsite services and group therapy services could be reimbursed at special rates that this court should not disrupt." *Id.* It granted summary judgment to the Commissioner on this issue as well.

With respect to the challenge to 2004 Update setting forth guidance on billing practices for dental services, the district court reasoned that "this statement in no way represents a new policy . . . but rather the optimal standard of care." *Id.* at 147. Noting that FQHCs are entitled only to "costs that are reasonable," *id.* at 147 (citing 42 U.S.C. § 1396a(bb)), the district court granted summary judgment to the Commissioner on this issue.

The district court next considered the challenges raised to New York's supplemental payment methodology. It first concluded that CMS had not

25

considered the methodology being challenged, and that it would thus review New York's development of this methodology de novo. *Id*. at 142. With respect to the substantive validity of the Supplemental Payment Program, the district court rejected the Health Centers' argument that "there is a simple mathematical equation for determining supplemental payments." *Id.* at 143. Noting the "multiple possibilities for calculating the PPS rate for any FQHC," the district court concluded that the "range of options does suggest that States might retain some flexibility in how to adopt their own approaches in rate setting." *Id.* at 143–44. Having rejected the Health Centers' objection to a prospective approach to supplemental payment obligations as such, the district court noted that specific challenges based on the PPS rate and the rate of payment for offsite services had federal approval, and thus the supplemental payment methodology was not invalid on those grounds either. *Id.* at 144. It thus granted summary judgment to the Commissioner.

Next, the district court considered New York's policies with respect to non-payment to FQHCs by MCOs. The district court determined that "the fact that there is no mechanism by which FQHCs are reimbursed for services actually furnished under MCO contract and not paid by the MCO is troublesome and in clear contravention of the plain language of 1396a(bb)(5)." *Id.* at 145. It continued

as follows:

> [T]he FQHC is the clear beneficiary of the statute and the State has a clear responsibility to make a supplemental payment "in the case of services furnished by a FQHC." This supplemental payment must be equal to the amount by which the PPS rate exceeds the payments provided under the contract. Notably, the phrase "payments provided under the contract" permits deduction only of amounts *actually* paid by the MCO to the FQHC. Whether or not the MCO makes a payment, the State is responsible for the supplemental payment (which may in fact be the entire PPS rate, if the MCO fails to make a payment).

> There is no basis for the State's conclusion that the FQHC must accept the loss because the MCO denied payment for an otherwise legitimate visit. Determining the amount the MCO will pay is certainly necessary for the calculation of supplemental payments, but the MCO's determination of validity cannot be the end of the inquiry. There are many reasons why a MCO might not pay an otherwise valid claim.

> To prevent fraudulent claims as the State certainly has an interest in doing, these payments might properly be reserved for a more robust audit or administrative process. The current audit process by DOH's Bureau of Managed Care Certification and Surveillance is only available "on the grounds that the health care service is not medically necessary or is experimental or investigational." N.Y. Comp. Codes R. & Regs. tit. 10, § 98–2.1 (2013).

*Id.* (some internal citations omitted). The district court granted summary

judgment to the Health Centers on this issue and enjoined the Commissioner's

policy "until modified in the manner set forth in this Opinion." *Id.*

Turning to the issue of out-of-network reimbursement, the district court

27

similarly concluded that "in the absence of a contract with an MCO, the State instead is wholly responsible for the reasonable costs of the FQHC at the prevailing PPS rate." *Id*. However, given that Section 1396b(m)(2)(A)(vii) allows the state to contractually allocate to the MCO the obligation to pay for services provided by out-of-network FQHCs, the district court reasoned that "[t]here is a conflict (or at least a substantial loophole) in the understanding of the Medicaid framework and the State-MCO contract." *Id.* at 146. This is because under Section 1396a(bb)(5), the state is responsible for a gap between MCO and FQHC payment (in the form of the supplemental payment) but, in the case of out-of-network services, the state delegated FQHC payment to an MCO. *Id.* The district court reasoned that "the burden of this loophole should never fall on FQHCs, which are covered by the federal statute for their services." *Id.* The district court thus enjoined "[t]he State's failure to pay for out-of-network services not paid by the MCO." *Id.* at 147.

Finally, the district court found that the balance of equities favored injunctive relief, *id.* at 148, and this determination is not challenged by the Commissioner on appeal.

**B.      Injunctions**

Following its decision on summary judgment, the district court ordered the

Commissioner to submit a "plan of action . . . that, in the event of non-payment by the MCO, provides for (1) full reimbursement to FQHCs for services provided, subject to verification by the Commissioner; and (2) full reimbursement to FQHCs who provide Medically Necessary Services." Special App'x at 31. The district court approved New York's proposed plan on July 26, 2013. Special App'x at 34. There is no appeal from this order, and its scope and particulars are not before us.

The Health Centers now appeal the various grants of summary judgment to the Commissioner, and the Commissioner cross-appeals the grants of summary judgment to the Health Centers.

## STANDARD OF REVIEW

We review the grant of summary judgment de novo. *Westport Bank & Trust Co. v. Gerahty*, 90 F.3d 661, 668 (2d Cir. 1996). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As in such a motion before the district court, on appeal "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**DISCUSSION**

**I.   New York's CMS-Approved Methodologies for PPS Payments are Entitled to Deference**

The Health Centers are challenging two methods for Medicaid reimbursement—the general PPS reimbursement rate developed by the DOH, and the special PPS rate for certain other services—which CMS specifically approved as amendments to the state plan. As eventually codified in New York, the general reimbursement rate was established by "grouping facilities to establish cost center ceilings" on a geographic basis. 10 N.Y.C.R.R. § 86-4.14(d). The cost center ceilings are "computed at 105 percent of the adjusted weighted average base year costs of the facilities in the cost center group." 10 N.Y.C.R.R. 86-4.14(c). Of course, if an FQHC was operating at less than the peer group ceiling at the time that DOH was implementing its PPS methodolgy, then its per-visit rate for services reflects "that center's actual operating costs per visit." App'x at 485.

The entirety of this methodology, and more, was proposed by New York, and reviewed by CMS, in a series of eight letters exchanged between March 29, 2001, and April 12, 2002. DOH first submitted SPA 01-03, proposing the general PPS methodology implementing the prospective change for FQHC

30

reimbursements to CMS on March 29, 2001. CMS asked specifically what "the State's proposed methodology . . . [PPS], or an alternative methodology? If New York chooses the PPS methodology, it should explain its derivation. . . . If the State chooses to implement an alternative methodology, the methodology must be agreed to by the State and each center/clinic." App'x at 308. After a series of letters between DOH and CMS, which further clarified CMS's concerns and required DOH to make certain adjustments to its proposed amendment, on February 5, 2002, CMS explicitly requested information regarding the use of both peer-group ceilings, and an explanation of the reasons for reimbursing FQHCs at a rate that was "the lower of" the 105 percent reimbursement and a given center's average costs. App'x at 330. On March 18, DOH responded, "Peer groups are established by grouping facilities offering similar types of services and having similar regional economic factors." App'x at 335. Explaining the 105 percent cost ceiling, DOH explained that it "allows for variability of costs within the peer group." *Id.* In its next letter, CMS approved SPA 01-03 on April 12, 2002.

DOH submitted SPA 06-11, for CMS approval on February 27, 2006. Now codified at 10 N.Y.C.R.R. 86-4.9(h)-(i), this amendment proposed to make FQHCs eligible for receiving reimbursement for providing group psychotherapy and offsite services. Both of these services are reimbursed at a rate which DOH

31

calculates "using elements of the [Resource] Based Relative Value System (RBRVS) promulgated by [CMS]." App'x at 379. CMS asked for further guidance regarding the exact methodology that DOH would apply to calculate the value of these services, and the DOH responded by laying out for CMS the precise formula it would apply in order to derive the payment rate for group psychotherapy and offsite services. On October 30, 2006, CMS approved SPA 06-11.

We have not yet spoken on the proper level of deference that we are to afford to CMS in a case such as this, namely, where CMS has specifically approved, after consultation with a state agency, the state's adoption of an SPA. The closest that we have come to the issue is *Wilson-Coker*, where we were called to determine the deference owed to a state plan that incorporated a CMS-developed, though not officially-promulgated, "productivity screen." *Wilson-Coker*, 311 F.3d at 134-35. A "productivity screen" is "[a] productivity standard [that] imposes a minimum visit requirement on affected providers, [such that] if a health care provider does not meet or exceed the minimum number of patient visits per year, its reimbursement is reduced in proportion to the amount by which the provider feel short of the minimum." *Id.* at 134-35. Connecticut passed legislation to implement this screen, but state regulations to reflect these changes

32

were not implemented until 2001, at which point CMS approved the use of screens. Plaintiff, an FQHC, challenged the use of screens during 1999 and 2000, which was relevant because those were the two baseline years for implementing a PPS methodology under Section 1396a(bb)(2), and as a result "shortfalls in that period will result in a reduction in the amount of money [an FQHC] receives in the future for each visit." *Id.* at 136. We considered what would constitute a "reasonable cost" under Section 1396a(bb)(2), and specifically, whether a limitation based on a "productivity screen" could constitute such a cost. We noted that the phrase "reasonable costs" was ambiguous, *id.* at 137, and that "[i]n resolving this ambiguity, we owe some significant measure of deference to CMS's interpretation of the statute, although we need not decide the exact molecular weight of the deference we accord to CMS's position," *id.* at 137-38. We then reversed the decision of the district court on the ground that its interpretation of reasonable and related costs was inconsistent with CMS's position. *Id.* at 139. The general lesson of *Wilson-Coker*, then, is that CMS's interpretation is probative of the meaning of the repayment provisions to FQHCs laid out in Section 1396a(bb).

Other circuits to consider this issue have been unanimous in holding that a CMS decision approving an SPA is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Managed*

*Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1240 (9th Cir. 2013) ("[T]he Secretary's approval of California's requested reimbursement rates . . . is entitled to deference under *Chevron*."); *Christ the King Manor, Inc. v. Sec'y of U.S. Dep't of Health and Human Servs.*, 730 F.3d 291, 307 (3rd Cir. 2013) ("SPA approvals are . . . the type of agency action that warrants *Chevron* deference . . . ."); *Harris v. Olszewski*, 442 F.3d 456, 467 (6th Cir. 2006) ("[T]he agency's approval of the state plan amendment is entitled to *Chevron* deference."); *Pharm. Research and Mfrs. of America v. Thompson*, 362 F.3d 817, 822 (D.C. Cir. 2004) (holding the "Secretary's interpretations of the Medicaid Act are . . . entitled to *Chevron* deference").

"[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218 226-27 (2001); *see also Christ the King Manor, Inc.*, 730 F.3d at 306. And, while the Supreme Court has not spoken directly on the issue, in *Douglas v. Independent Living Center of Southern Calif.*, "the Supreme Court said that '[t]he Medicaid Act commits to the federal agency the power to administer a federal program,' and that, in approving a[n] SPA 'the agency has acted under [that] grant of authority.'" *Christ the King Manor,*

34

*Inc.*, 730 F.3d at 306 (alterations in original) (quoting 132 S. Ct. 1204, 1210 (2012)); *see also Managed Pharmacy Care*, 716 F.3d at 1246. Thus, agency approval "'carries weight,' especially when 'the language of the particular provision at issue . . . is broad and general.'" *Christ the King Manor, Inc.*, 730 F.3d at 306 (omission in original) (quoting *Douglas*, 132 S. Ct. at 1210). We find the reasoning of our sister circuits on this issue persuasive. And this reasoning compels the conclusion that New York's CMS-approved PPS methodolgies are permissible under Section 1396a(bb).

Under the familiar two-part *Chevron* analysis, we are "require[d] to abide by an agency's interpretation or implementation of a statute it administers if Congress has not directly spoken 'to the precise question at issue' and if the agency's answer is 'permissible' under the statute." *Managed Pharmacy Care*, 716 F.3d at 1246 (quoting *Chevron*, 467 U.S. at 842-43); *see also Sash v. Zenk*, 428 F.3d 132, 136–38 (2d Cir. 2005) (applying two-step *Chevron* framework to ambiguous statute governing good behavior credits for federal prisoners).

It is beyond debate that Congress did not speak precisely as to the methodology for calculating the PPS rate in Section 1396a(bb)(2). We have already held as much with respect to Section 1396a(bb)(1), which requires that "the State plan shall provide for payment for services" furnished by FQHCs, but

35

does not specify a particular payment method for states to use. *Wilson-Coker*, 311 F.3d at 139. Section 1396a(bb)(2), as well, includes the same language regarding the state's obligation to provide for payment, but specifies that this payment must be "equal to 100 percent of the average of the costs of the center or clinic . . . during fiscal years 1999 and 2000 which are reasonable and related to the costs of furnishing such services, or based on such other tests of reasonableness as the Secretary prescribes in regulations." The Secretary has not provided such tests of reasonableness. *Wilson-Coker*, 311 F.3d at 137, leaving us with the alternative provision of Section 1396a(bb)(2). Congress did not prescribe any single method as the only way in which states would be permitted to calculate average reasonable and related costs. In Section 1396a(bb)(2), Congress has left this to the states and CMS to develop, in trusting the partnership and spirit of "cooperative federalism" that Medicaid envisions, *Wis. Dep't of Health and Family Svcs.*, 534 U.S. at 496, to result in a methodology which will give meaningful and appropriate content to the term.

It remains for us to determine, then, whether CMS, in approving an SPA that made arrangements for calculating average costs based on a methodology that imposed cost-ceilings based on regional groupings was approving a PPS methodology that was "permissible" within the meaning of Section 1396a(bb).

36

*Chevron*, 467 U.S. at 842-43. We have no problem concluding, as the district court did, that such an approach is well within the range of permissible readings of the statute. Nothing in the statutory FQHC-reimbursement provisions forbids states from grouping similar FQHC providers in its initial analysis of services provided during 1999 and 2000. The mere fact that the FQHCs believe these groupings to be arbitrary does not establish that they are impermissible under Section 1396a(bb)(2); this is especially true given that the FQHCs have produced no evidence at summary judgment that such groupings actually result in FQHCs being reimbursed at a rate less than that required to cover their costs of providing services. Indeed, even if they did, an individual FQHC could still appeal for an adjustment to this reimbursement if the services it provides are "unique within [its] peer group." App'x at 211.

We affirm the district court's judgment with respect to SPA 06-11, also approved by CMS, for substantially similar reasons. It is clear that the Medicaid Act does not speak directly to the question of how to reimburse FQHCs for the offsite and group psychotherapy services covered in SPA 06-11, and in light of the Commissioner's submission that such services ought to be reimbursed at a lower rate because they "do not present the same costs for an FQHC that a standard individual clinic does," an assertion that goes unchallenged by the

37

Health Centers, we think such a policy entirely permissible under the statute, *Chevron*, 467 U.S. at 842-43.

The Health Centers mount an additional collateral attack on CMS's approval of this special rate for offsite and group therapy services. They assert that this special PPS rate must be analyzed under Section 1396a(bb)(6) rather than Section 1396a(bb)(2). Section 1396a(bb)(6) allows for a state to make reimbursement to FQHCs for services "under an alternative payment methodology that—(A) is agreed to by the State and the center . . . ; and (B) results in a payment to the center . . . of an amount which is at least equal to the amount otherwise required to be paid to the center . . . under this section." The Health Centers assert that the special PPS rate is an alternative payment methodology and that, because they have not agreed to it, it is invalid under this provision.

The Health Centers' reading of the statute is simply untenable. The statute contemplates three methods for FQHC reimbursement: first, through the general PPS rate set by states with CMS approval, 42 U.S.C. § 1396a(bb)(2); second, through reimbursements that are "based in such other tests of reasonableness as the Secretary prescribes," *id.;* and third, through a general "alternative payment methodology" whose availability is codified at Section 1396a(bb)(6). Thus Section

38

1396a(bb)(6) cannot be read to modify the provisions of a general PPS rate under Section 1396a(bb)(2). Rather, "alternative" means what it says, namely, that Section 1396a(bb)(6) allows states and FQHCs, if in agreement with one another, to eschew the PPS methodology of Section 1396a(bb)(2) altogether. *See Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 207 (4th Cir. 2007) ("The Medicaid Act . . . allows for two methods of reimbursement. The first method is a 'prospective payment system' based on historical-average costs plus a cost-of-living factor. 42 U.S.C. § 1396a(bb)(2). The second method, set forth in § 1396a(bb)(6), authorizes an 'alternative payment methodology' that can take a number of forms." (footnote omitted)); *Rio Grande Cmty. Health Ctr., Inc.*, 397 F.3d at 62 (describing requirements of Sections 1396a(bb)(2)--(3) and noting that "[a] state may only deviate from the very specific payment methodology of the PPS if the FQHC involved gives its consent and there is no reduction in the total payments made as compared to the PPS method"). The Health Centers' contrived reading of Section 1396a(bb)(6) would make every deviation in payment for provision of separate services an "alternative payment methodology." We reject such a reading.

"We take care not lightly to disrupt the informed judgments of those who must labor daily in the minefield of often arcane policy, especially given the

substantive complexities of the Medicaid statute." *Wilson-Coker*, 311 F.3d at 138. The Health Centers fail to explain why we ought to abandon this principle here. Despite every opportunity to produce evidence that the decisions at issue impacted their bottom line, they are left at this point only with the bald assertion that New York's methodology in aggregate costs them millions of dollars. But this assertion is not tethered to any evidence in the record, but only to DOH documents calculating each Center's original PPS rate. This evidence does not create a genuine dispute of material fact as to whether the FQHCs actually have been shortchanged under the PPS system. It certainly does not provide us with justification to upset the considered determination of DOH and CMS.

**II.     The State's 2004 Guidance Letter Regarding Payment for Dental Services Did Not Work an Unreasonable Change on the Baseline Calculation for Payment for Services During the 1999 and 2000 Fiscal Years**

The Health Centers next argue that the 2004 Medical Update, which encouraged all Medicaid service providers (not just FQHCs) to provide dental cleaning and examination services during the same visit is unlawful. FQHCs may still be reimbursed for cleaning and examination services provided on separate visits. However, the billing statement must include a notation that explains why services were offered on separate visits.

The Health Centers argue that this change works an effect on the rates set, because "it changes what was in fact two visits (in the base years [1999 and 2000]) to one visit without an adjustment to the affected FQHC's per visit rate (to account for the resulting higher cost per visit)."

We disagree with the Health Centers that the change worked by New York's 2004 Medicaid Update results in an impermissible state policy under Section 1396a(bb)(2). The Health Centers direct us to absolutely no language in the statute, nor to a principle of interpretation, that would help us to recognize their contention regarding New York's dental billing practices guidance as a legal argument, rather than a mere observation.[2]

The Health Centers argue that they may succeed in challenging New York's dental billing practices "even if the State's consolidation requirement reflects the proper standard of care." This argument verges on the self-refuting.

---

[2] The Health Centers argue that this policy worked a change in Medicaid repayment, and point out this change was without CMS approval. However, they do not argue they have a cause of action to challenge this putative procedural shortcoming. We note, though we need not hold, that there likely is no such cause of action. *See N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 538–39 (collecting cases and holding that no private right of action existed under Section 1983 to bring challenges to the state's failure to seek CMS approval to a change in state programs); *Developmental Servs. Network v. Douglas*, 666 F.3d 540, 547–49 (9th Cir. 2011). For similar reasons, we do not pass on FQHC's assertions that the DOH's Supplemental Payment Program was a change requiring CMS approval. *Infra* at [48-54].

Section 1396a(bb)(2) contemplates only reimbursement for the "reasonable and related costs" of providing services to FQHC patients. We may grant the Health Centers' argument that their "literal heap of evidence" established that it was the practice of Health Centers with dental clinics to bill for separate visits for dental examinations and teeth cleanings (a proposition on which we remain agnostic). However, there is no evidence in the record that such a practice conformed with the proper standard of care. And the Commissioner has submitted evidence that there are at least two justifications for requiring these services to be provided in a single visit. First, it decreases the transportation costs of each visit, which Medicaid is required to reimburse. Second, the Commissioner argues that a multi-visit policy results in inconvenience to patients, who are forced to make multiple trips when one would suffice.

Even construing this evidence in the light most favorable to FQHCs on this point, as we must, we have no difficulty concluding that requiring FQHCs to provide two dental services in a single visit, or explain why it did not do so, is an eminently "reasonable" requirement under Section 1396a(bb)(2). As such, even if the FQHCs were providing these services in two visits during 1999 and 2000, New York cannot be required to make an adjustment to a Health Center's PPS rate based on this set of circumstances. The mere fact that FQHCs were engaging

in practices that led DOH, perhaps mistakenly, to credit them for costs not reasonably related to the provision of services during the time that the DOH was calculating PPS rates for FQHCs does not mean that FQHCs were entitled to rely on that unreasonable practice in perpetuity. So long as the current rate, and application of New York billing practices, reflects only "reasonable" costs, it is in compliance with Section 1396a(bb)(2).

To be fair to the FQHCs, we note that there might well be important justifications for an FQHC to provide dental examinations and dental cleanings on separate visits. We can imagine, for example, that because FQHCs are often remotely located it might be impossible to staff an FQHC for both services on the same day, or that an FQHC may only wish to provide one or the other of the services based on community needs, and so forth. The Medicaid Update provides what we consider to be a costless solution to this conundrum, by allowing FQHCs to annotate the justification for billing unbundled dental services. The FQHCs provide no explanation as to why this is not a reasonable solution.

III. **New York's Methodology with Respect to Making Supplemental Payments to FQHCs Does Not Fully Satisfy the Requirements of Section 1396a(bb)(5)**

In addition to challenges to the PPS method for establishing each Health Center's reimbursement rate pursuant to the general requirements of Section

43

1396a(bb)(1)--(2), the Health Centers also challenge New York's methodology for making reimbursement payments to Health Centers that provide services pursuant to a contract with an MCO. Section 1396a(bb)(5) contemplates such an arrangement, requiring that in such a situation, "[i]n the case of services furnished by a[n] [FQHC] . . . pursuant to a contract between the center . . . and a managed care entity . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under paragraph (2) [and] (3) . . . of this subsection exceeds the amount of payments provided under the contract." Paragraphs (2) and (3), as already described, first lay out the state's general PPS methodology for per-visit payments, and also set out the rate by which these payments increase going forward, to keep pace with inflation. 42 U.S.C. § 1396a(bb)(2)–(3). The statute thus contemplates that there will be a difference in the amount that the MCO contracts to pay the FQHC. In keeping with the general goal of Congress to ensure that FQHC grants do not subsidize Medicaid generally, Congress has provided that the FQHC grants should also not subsidize Medicaid managed care. And it is also in keeping with the Congressional goal that FQHCs should provide Medicaid services to MCO enrollees: prior to this statute, the requirement was that MCOs would have to contract with FQHCs to pay the full

44

rate for services themselves. *See generally N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 540–41. The deletion of this provision allows MCOs to negotiate their own rate for FQHC care of MCO enrollees, incentivizing MCOs to contract with FQHCs. The state's responsibility remains to avoid allowing Section 330 Medicare grants to cross-subsidize Medicaid programs. *See Three Lower Cnties.*, 498 F.3d at 297.

CMS has never approved New York's methodology for providing payment of the difference between an FQHC's PPS rate and the amount provided for under the contract between the MCO and the FQHC. SPA 01-03 "at least mentioned the supplemental payment methodology." *Cmty. Health Care Ass'n of New York*, 921 F. Supp. 2d at 141. However, New York's methodology for calculating this payment, as laid out in SPA 01-03, closely tracks the language of 42 U.S.C. § 1396a(bb)(5). Any supplemental payment methodology was not based on the agency's expertise or consideration of the State's interpretation of the supplemental payment methodology as consistent with the Medicaid requirements." *Id.* at 141–42. As this presents a question of law, our review of New York's methodology for calculating this supplemental payment to FQHCs is de novo. *See Turner v. Perales*, 869 F.2d 140, 141 (2d Cir. 1989) ("[T]he question is whether the state law and implementing regulations are consistent with federal law. This is an issue of law, subject to *de novo* review in federal court . . . .").

45

The current[3] supplemental payment "is the average difference between what [the] FQHC is paid by contracted MCOs and its specific blended Medicaid rate for each year. The blended Medicaid rate is a weighted average of the center's PPS rate, offsite service rate, and group counseling rate." *Cmty. Health Care Ass'n of New York*, 921 F. Supp. 2d at 135 (internal quotation marks omitted).

The Health Centers raise a number of objections to this policy. We may dismiss one immediately. Having resolved the Health Centers' challenge to the use of a special rate for offsite and group services above, we find nothing objectionable in their inclusion in New York's wraparound methodology. Next, the Health Centers challenge New York's general policy of employing a prospective methodology to establish an FQHC's wraparound rate. The Health Centers contend that such a method conflicts with the substantive provisions of Section 1396a(bb)(5), in particular its requirement that states reimburse FQHCs in amounts that are "equal to" the difference between the Center's PPS rate and the amount paid by the MCO. The district court rejected this challenge, as do we.

---

[3] Like the district court, we note that the rate described above differs in some respects from the prospective rate first introduced in 2007, in that it includes payments for offsite and group therapy services, but, because the Health Centers seek only prospective relief, it is unnecessary to determine with specificity when the state made this modification to its supplemental payment methodology. *Cmty. Health Care Ass'n of New York*, 921 F. Supp. 2d at 135 n.3.

**A. Section 1396a(bb)(5) Permits a Prospective Methodology for Calculating Wraparound Rates**

The Health Centers challenge, as a general matter, New York's decision to employ a prospective method for calculating a given Health Center's wraparound rate using data from the previous year's Medicaid eligible encounters. Importantly, they do not challenge the use of any of the specific inputs in this calculation, such as the Medicaid blended rate, outside of the challenges to the PPS and other inputs in this calculation which we have already found, above, to be compliant with the requirements of Section 1396a(bb). The crux of the Health Centers' argument is that Section 1396a(bb)(5) requires that the wraparound payment be "equal to" the difference between the rate paid to the Centers as a result of the PPS rate, and the amount paid to the Centers by the MCOs. Thus, the Health Centers conclude that Section 1396a(bb)(5) sets up a "'simple equation' that results in a precise number."

We cannot endorse the Health Centers' unnecessarily restrictive reading of Section 1396a(bb)(5). It is true that "[w]hen the statutory language is plain, the sole function of the courts . . . is to enforce it according to its terms." *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (internal quotation marks omitted). But there are no terms in this statute that establish the exact

mechanism by which states must calculate the difference between the PPS payments and the MCO payments. Further, we think it unlikely that Congress would provide a wide "measure of discretion . . . in choosing how to expend Medicaid funds," *Wilson-Coker*, 311 F.3d at 134, as a general matter, only to hamstring state reimbursement in a particular instance by prescribing, without any CMS input, a single method for calculating the state's wraparound payment obligation.

An examination of the structure and purpose of the statute supports New York's decision to employ a prospective methodology to calculate the wraparound payment rate to FQHCs. "Mere incantation of the plain meaning rule, without placing the language to be construed in its proper framework, cannot substitute for meaningful analysis. . . . The appropriate methodology . . . is to look to the common sense of the statute . . . , to its purpose, to the practical consequences of the suggested interpretations, and to the agency's own interpretation for what light each inquiry might shed." *N.Y. State Comm'n on Cable Television v. FCC*, 571 F.2d 95, 98 (2d Cir. 1978) (internal quotation marks omitted). Here, it is clear that Congress exhibited a preference for states to implement a prospective methodology to calculate reimbursement rates to FQHCs. To adopt the reading urged by the Health Centers, forbidding

48

prospective calculation of the wraparound rate under Section 1396a(bb)(5), would require us to read the statute at cross-purposes with itself. We will not conclude that the general preference for prospective payment in Section 1396a(bb)(2) is undercut by the requirement of equal payments in Section 1396a(bb)(5).

Additionally, CMS guidance on the implementation of Section 1396a(bb) supports the conclusion that the statute allows for prospective payment of the wraparound rate. As the Third Circuit has explained, the need to make wraparound payments first arose as a result of the passage of the BBA in 1997, which "removed the responsibility of MCOs to reimburse FQHC[]s at their cost-based rates . . . . Rather, MCOs could agree on a contractual reimbursement rate as long as that rate was no less than the amount offered to a non-FQHC." *New Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 540. The wraparound payment scheme was implemented to ensure that even in managed-care states, FQHCs still received the full reimbursement amount. *Id.* An interpretive letter to state Medicaid Directors from CMS, which the Third Circuit found persuasive in addressing a related challenge to New Jersey's payment methodology for

49

FQHCs,[4] specifically declared, "The State payment system for the supplemental payments may utilize prospectively determined rates or may pay interim rates subject to reconciliation." April 20, 1998, Health Care Financing Administration State Medicaid Director Letter, *available at* http://medicaid.gov/Federal-Policy-guidance/federal-policy-guidance.html.

The Health Centers urge that this letter refers only to the general alternative payment methodologies provisions of Section 1396a(bb)(6), which was enacted later, but this argument fails. As we have explained above, Section 1396a(bb)(6) is most naturally read, in the context of the statute, as providing states and FQHCs an avenue to avoid the general provisions of Section 1396a(bb), not specific aspects of the statute such as the PPS rate or, in this case, a prospective methodology for calculating a wraparound rate. *See Pee Dee Health Care, P.A.*, 509 F.3d at 207.

The Health Centers unsuccessfully attempt to rely on *Three Lower Counties* and *N.J. Primary Care Association* for the proposition that the "equal to" language in Section 1396a(bb)(5) is dispositive. True, in both those cases the Third and Fourth Circuits stressed this language to emphasize the obligations of the state

---

[4] As the Third Circuit noted, and as we agree, the approach adopted in this letter is entitled to deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *New Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 541 n.5.

50

with respect to FQHCs. But in those cases, the Courts of Appeals were considering state repayment methodologies in cases where the state either admitted that its methodology would lead the state to fail to make whole the FQHCs, *N.J. Primary Care Ass'n, Inc.*, 722 F.3d at 540 ("[T]he State concedes that the methodology it has chosen . . . will result in failures to fully reimburse FQHCs at the PPS rate for valid Medicaid claims."), or the evidence overwhelmingly demonstrated that the state's methodology led to shortfalls for FQHCs, *Three Lower Cnties.*, 498 F.3d at 300 (Maryland's method of providing partial supplemental payment to one health center, then later reconciling the difference, led to a shortfall of almost $2 million dollars for the center). This is not the case here. At least as a general matter (that is, absent a consideration of the "paid claims" policy, which we will soon turn to) the Health Centers have presented no evidence that a prospective method of calculating the FQHCs' wraparound payment has produced, or will produce, systematic shortfalls to the FQHCs.

Finally, in interpreting this statute we must consider the "practical consequences" of our reading. *N.Y. State Comm'n on Cable Television*, 571 F.2d at 98. The Health Centers argue that the prospective methodology was implemented "for no fathomable reason." But the Health Centers' own briefs

51

concede not only a fathomable, but entirely reasonable, justification for introducing a prospective calculation of the wraparound payment. The Health Centers acknowledge that under the previous, non-prospective system, between 2001 and 2007, it took on average three years for New York to appropriately reimburse Health Centers the wraparound rate to which they are statutorily entitled. Thus, New York was not in compliance with its obligation to make wraparound payments within the four-month time period laid out in Section 1396a(bb)(5)(B). Our recognition of these practical consequences, moreover, in no way invents a "burdensomeness defense," *Three Lower Cnties.*, 498 F.3d at 301, to a state's obligation to make wraparound payments within the four month time period laid out in Section 1396a(bb)(5)(B). This is because, as we have already explained, there is no evidence that FQHCs are being shortchanged by the existence of a prospective wraparound methodology as such.

In sum we, like the district court, reject the Health Centers argument that there is a "simple mathematical equation for determining supplemental payments," *Cmty. Health Care Ass'n of New York*, 821 F. Supp. 2d at 143, and affirm the district court's conclusion that New York's decision, as a general matter, to employ a prospective methodology to calculate a given FQHC's wraparound rate is not contrary to Section 1396a(bb)(5).

52

**B.    Section 1396a(bb) Does Not Permit the Cost of MCO Non-Payment to be Borne by FQHCs**

The Health Centers raise two challenges to New York's policies regarding the risk that an MCO will not reimburse an FQHC for services it provides. Both challenges raise the possibility that FQHCs will "be left holding the bag," *New Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 541, a clearly impermissible result given that "the FQHC is the clear beneficiary of the statute, and the State has a clear responsibility to make a supplemental payment in the case of services furnished by a[n] FQHC." *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 145 (internal quotation marks omitted). Further, because the risk of non-payment by an MCO now has no remedy in New York's prospective calculation of an FQHC's wraparound payment, aspects of New York's prospective wraparound payment methodology must also be enjoined.

**1.    FQHCs Cannot Be Required to Bear the Cost of Non-Payment by an MCO for Services to an MCO Enrollee**

While the use of a prospective payment system for calculating the wraparound rate that a state must pay to an FQHC is permissible under Section 1396a(bb)(5)(A), the particular manner in which New York has determined that it will determine its wraparound obligation creates the impermissible risk that

FQHCs will bear the cost of non-payment by MCOs for Medicaid services that they provide.

The entirety of New York's supplemental payment system is set out in a document called the Supplemental Payment Program. The Supplemental Payment Program, which was not issued pursuant to any official state regulatory procedure, but rather emailed and posted to the FQHCs, and is not available on DOH's website, consistently gives the impression that FQHCs are only entitled to report, and thus claim a wraparound reimbursement for, Medicaid encounters for which an MCO has paid an FQHC. Thus, the Supplemental Payment Program reads as follows; "Each qualifying FQHC's 'supplemental payment' is the average difference between what that FQHC *is paid* by contracted MCOs and its specific blended Medicaid rate;" "FQHCs must list . . . the number of visits [for which] each [MCO] *paid* the FQHC;" "The information . . . submitted . . . may be validated by the [DOH] using . . . : Medicaid *paid supplemental claims* billed by FQHCs for the period, MCO encounter data showing *paid* FQHC visits, MCO . . . Reports . . . which list contracted FQHCs and *paid* visits;" "Supplemental claims cannot be billed for visits for which the MCO denies *payment*." App'x at 629--30, 632--33 (emphasis added). Additionally, the MCVR Report in which FQHCs must report the number of MCO visits for which they have been paid in order to

generate their supplemental payment for the coming year includes a column which only references the "Number of Visits Paid by [MCO]." App'x at 627.

Notwithstanding the emphasis on paid visits in the Supplemental Payment Program, the Commissioner's contends, based on evidence consisting of deposition testimony and affidavits from DOH officials, that the FQHCs may claim reimbursement for services they provided pursuant to an MCO contract for which they have not been paid for the purposes of receiving a wraparound payment.

In addition, the Commissioner also contends that, in the event that an MCO determines that it does not have an obligation to pay an FQHC, and New York has made a supplemental payment to the FQHC, the FQHC is under an obligation to return the payment. If the FQHC believes that the MCO is in the wrong, then the Commissioner takes the position that the FQHC must "vigorously pursue its complaint, both with the [MCO] in question and DOH's Bureau of Managed Care Certification and Surveillance ('BMCCS')." App'x at 421.

The district court concluded that there was one primary method available to FQHCs to contest MCO non-payment, which is codified in the New York regulations. 10 N.Y.C.R.R. § 98-2.1. This complaint mechanism, however, is only

55

available where the MCO denied payment "on the grounds that the health care service is not medically necessary or is experimental or investigational." *Id.*

On appeal, the Commissioner argues that this was incorrect, as the BMCCS has its own internal complaint mechanism. The entirety of the evidence of this alternative complaint mechanism, which also is not codified anywhere in New York regulations, consists of a document called the "Policies and Procedures for Managed Care Organization Complaints" ("Complaints Policy"). The Complaints Policy defines a "complaint" as a "written or verbal contact to the Department." It appears that the BMCCS itself has no authority to compel action by either a different branch of the DOH, nor MCOs themselves, but rather, only to inform other branches of DOH, or MCOs, of the validity of complaints which it processes. And the areas which BMCCS may investigate with respect to reimbursement procedures are extremely circumscribed: "Generally, there is no authority for [DOH] to intercede in payment disputes between providers and their managed care plans as reimbursement is governed by the terms of the contract." App'x at 440. Finally, the Complaints Policy indicates that "The New York State Insurance Department reviews 'prompt pay' complaints." *Id.*

The fundamental shortcoming with the Supplemental Payment Program and the Complaints Policy is that together these policies make the MCO the

ultimate arbiter of the reimbursability of services that an FQHC provides "pursuant to a contract" with an MCO. 42 U.S.C. § 1396a(bb)(5)(A). This cannot be squared with the text of Section 1396a(bb)(2), which imposes an absolute burden on the state to reimburse FQHCs for the entirety of their reasonable costs. Nor can it be squared with the clear intent of Congress to ensure that Section 330 centers do not end up subsidizing state Medicaid programs. The Commissioner does not dispute "that MCOs often deny payments for reasons unrelated to Medicaid . . . e.g., MCO delays, multiple visits in different locations in the same day, and visits with non-primary care physicians." *New Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 542. The result is the potential for FQHCs to be reimbursed neither by MCOs, nor New York for services they provide.

Our conclusion is consistent with the holdings of the two other Circuits to consider this issue. In *Three Lower Counties*, the plaintiff health center challenged "Maryland's requirement that FQHCs submit claims to a Medicaid enrollee's managed care organization, rather than to the [DOH] . . . . Because [MCOs] process the claim initially and the State relies on this information, [plaintiff] believes that Maryland has improperly delegated to the [MCO] the determination of whether a supplemental payment is necessary." *Three Lower Cnties.*, 498 F.3d at 305. The Fourth Circuit rejected this challenge, finding that there was nothing in

the Medicaid Statute that prohibited such delegation. The decision thus turned on the question of whether a state institution, as opposed to a private institution, might have the initial authority to make a determination as to whether a supplemental payment was required. The outcome did not turn on the sufficiency of procedures by which an FQHC could challenge an MCO's decision with respect to payment—indeed, it does not appear as though such an argument formed part of the basis for the plaintiff's challenge in that case. It was not disputed that ultimately, "[t]he Department of Health itself . . . makes the determination whether a supplemental payment . . . is necessary." *Id.* at 305. The situation is precisely the opposite here. In light of the absence of any meaningful appeal process, the MCO's judgment is de facto final.

*New Jersey Primary Care Association* is similarly illuminating. New Jersey implemented a policy, on short notice, which changed the method for calculating wraparound repayments to FQHCs from one in which FQHCs were responsible for reporting data to the state to one in which the state calculated the wraparound payment using "FQHC claim data from MCOs." *New Jersey Primary Care Ass'n, Inc.*, 722 F.3d at 532-33. The Third Circuit rejected this approach to calculating the wraparound. Recognizing that "states may rely on MCOs to determine whether a claim is Medicaid eligible," the Court nevertheless went on

to rule that "[i]n the absence of any process by which an FQHC may promptly and effectively challenge an adverse MCO determination within the statutorily mandated time period," New Jersey's collection of wraparound data must be enjoined. *Id.* at 542-43. We find *New Jersey Primary Care Association* and *Three Lower Counties* persuasive. A state may take the MCO claim verification process into account in calculating its wraparound obligation, both prospectively and for a particular Medicaid encounter, but the MCO cannot be the final arbiter of whether a claim is Medicaid eligible.

On appeal the Commissioner argues that the district court "misunderstood the administrative review mechanisms that are available in New York." It attempts to buttress this point by arguing that "[t]he remedial plan approved by the district court did not create new administrative procedures or expand the grounds for relief under existing procedures, but rather, clarified the scope of those procedures—including by reminding FQHCs of their right to challenge action by MCOs contrary to Medicaid statutes and regulations."

The argument is entirely untenable. The basic premise is that neither FQHCs (the beneficiaries of the Complaints Policy) nor the district court (the first evaluator of the Complaints Policy) could appreciate all of the remedial options that New York made available to health service providers contracting with

59

MCOs. But if this is true, then that shortcoming must be borne by New York.

First, while we are not evaluating any claim that New York failed to follow its own administrative procedures in promulgating the Complaints Policy, we think it probative that the Complaints Policy that we are evaluating is, in essence, not a regulation or rule. Rather, it seems to be a working document prepared by the BMCCS, subject to change. While it sets out goals for the timely processing of complaints, it does not in any sense contain language that would bind BMCCS to its procedures.

Second, the terms of the document itself disclaim a general "authority for [DOH] to intercede in payment disputes between providers and their managed care plans as reimbursement is governed by the terms of the contract." App'x at 440. We think a plain reading of this document would give notice that the Complaints Policy does not provide a mechanism for Health Centers to take their grievances against an MCO to DOH.

Third, we do not understand the basis on which the Commissioner is asserting that the proposed injunctive relief "did not create new administrative procedures." The district court order entering this relief notes that the injunction, among other things, provides for "[s]pecial rate codes that permit plaintiff FQHCs to directly bill DOH payment for the full PPS rate for services [where

60

payment] was improperly denied." Special App'x at 33. It also standardizes the sequencing by which an FQHC may submit claims for payment and complaints, again using a special rate code. Special App'x at 34. Finally, it distinguishes between the contract remedies that FQHCs should use in pursuing their grievances against MCOs and grievances that should be brought before BMCCS in a way that, by clarifying BMCCS jurisdiction, cements the right of FQHCs to use these procedures. Special App'x at 34.

By failing to make available a meaningful mechanism, New York has not satisfied the obligations imposed on it by Section 1396a(bb)(5)(A). The district court's grant of summary judgment to the Health Centers on this issue is affirmed.

**2. FQHCs Cannot be Required to Bear the Cost of Non-Payment by an MCO for Services Provided to an Out-of-Network MCO Enrollee**

The Health Centers also challenge New York's policy of not reimbursing FQHCs when they provide services to an MCO enrollee if that enrollee receives services from an FQHC with which the MCO does not have a contract. The Commissioner relies on 42 U.S.C. § 1396b(m)(vii), which permits states using MCOs to implement their Medicaid programs to provide, in their contracts with MCOs, that either the MCO or the state provide reimbursement for "medically

61

necessary services" if "the services were immediately required due to an unforeseen illness, injury, or condition." New York opted to place this burden on MCOs in its standard MCO contracts. The Commissioner further argues that the plain text of Section 1396a(bb)(5)(A), which provides for supplemental payments only "pursuant to a contract," precludes the necessity of providing for a wraparound payment for out-of-network care, given that such services by definition would not be provided "pursuant to a contract." The thrust of the Commissioner's argument is that, for these services, the Health Centers simply "must absorb these costs." *Three Lower Cnties.*, 498 F.3d at 304. The Commissioner contends that this is a necessity in a managed care system, because MCOs are able to achieve efficiency only if they are able to "direct patients to certain providers." Further, they contend that because FQHCs generally lack emergency rooms, the situations in which an MCO would be called on to reimburse an FQHC pursuant to the model state-MCO contract will be rare.

We reject the Commissioner's contentions. While the Commissioner's argument that the use of FCHCs for emergency medically necessary services may be rare has force, it in no way answers the objection to the Commissioner's general position—requiring Health Centers simply to "absorb the costs"—that the statute requires that FQHCs be made whole.  It certainly falls short of

resolving the question of how FQHCs are to be reimbursed for such encounters. The Commissioner's response only minimizes the problem—it does not resolve it. Further, the Commissioner's reliance on New York's standard MCO contract under Section 1396b(m)(vii) is not persuasive. "It is a basic principle of statutory construction that a specific statute . . . controls over a general provision." *In re Stoltz*, 315 F.3d 80, 93 (2d Cir. 2002) (alteration in original) (internal quotation marks omitted). Here, the Commissioner is invoking the general provisions of Section 1396b(m), which deal with contractual arrangements between states and MCOs on the whole. But for reasons that we have explained above, FQHCs occupy a unique place in the health services ecology. The fact that MCOs are the primary avenue for payment for out-of-network emergency care under New York's standard contractual arrangements cannot relieve the state of its specific burden to ensure payment to FQHCs under Section 1396a(bb)(2).

Moreover, while the Commissioner is correct that Section 1396a(bb)(5) only includes language that requires a state to make a supplemental payment for a service provided "pursuant to" a contract, that obligation cannot be read in isolation from the general obligation that FQHCs receive "100 percent . . . of the costs . . . which are reasonable and related to the cost of furnishing services." 42 U.S.C. § 1396a(bb)(2). To the extent that out-of-network services constitute a part

of the services provided by FQHCs, there must be some arrangement by which FQHCs may be reimbursed for them. If that contractual arrangement is between the state and the MCO in the first instance, under Section 1396b(m)(vii), that is permissible. But if this arrangement stops short of ensuring full repayment for these services because there is no method for appealing an MCO's refusal to pay, then it does not comport with the statute. We agree with the Third Circuit that the fairest reading of the statute is to require MCO payment for services under Section 1396a(bb)(5) "[i]n light of . . . unmistakably clear statutory requirements." *Three Lower Cnties.*, 498 F.3d at 304. The proposed injunctive relief which the district court approved included the necessary procedural mechanism to ensure that FQHCs would have the opportunity to seek redress in the event of non-payment.

This reading appropriately balances the various Congressional incentives for providing services under Medicaid. Ultimately the state, holding the Medicaid purse strings, is in the best position to evaluate the failure, or success, of ensuring in-network care by MCOs in their dealings with FQHCs. If there is a problem in ensuring that this type of access is respected, then it falls to the state, in its wide "measure of discretion," *Wilson-Coker*, 311 F.3d at 134, to evaluate the reasons for this failure and to take the necessary steps to remedy this problem.

**C.** **Because There Are Disputed Issues of Material Fact as to How FQHCs May Claim Reimbursement for Unpaid MCO Claims for the Purpose of Calculating an FQHC's Prospective Wraparound Rate, the Decision of the District Court Must Be Vacated in Part**

The district court determined that "[an] FQHC may submit claims to MCO and DOH at the same time and receive the supplemental payment." *Cmty. Healthcare Ass'n of New York*, 921 F. Supp. 2d at 135. That determination resolved the Supplemental Payment Program's procedures for FQHCs to claim reimbursement for an MCO-covered encounter. However, it did not resolve the related issue of what data the FQHC may submit to New York in its MCVR Report for purposes of establishing its prospective wraparound payment rate. The FQHCs point out on appeal a disjunction between two components of the district court's decision. They note that while "[t]he district court correctly held that the [s]tate's paid claim policy is unlawful, . . . [it] did not address the fact the state's method of calculating each center's estimated wraparound 'rate' incorporates the very 'paid claim' policy the court declared unlawful." We agree with the FQHCs that the district court's decision seems internally inconsistent in this respect. While it may be undisputed that at the "retail" level the FQHC may put in a claim for a wraparound payment with New York at the same time that it

puts in a claim for payment pursuant to a contract with an MCO, this requested wraparound payment would be based on the wraparound rate set by the Commissioner based on data on revenue and visits from the previous year. This does not, however, answer the question of whether, at the "wholesale" level, in filling out the MCVR Report, the FQHC may report—and the Commissioner would include in his calculus— (a) the total number of visits for which an FQHC has been paid by the MCO, or (b) the total number of visits for which the FQHC provided services pursuant to a contract with an MCO, and for which it expects to be paid.

The distinction in the data reported by the FQHCs and relied upon by the Commissioner, in turn, may have a profound impact on New York's calculation of the FQHC's prospective wraparound rate. As the Health Centers explain, the prospective wraparound payment is calculated by dividing the FQHC's revenue from an MCO by the number of visits by MCO enrollees. Therefore, if the MCVR Report holds revenue constant, but "exclud[es] unpaid visits in the calculation of the average per visit . . . MCO payment[], the average MCO payment goes up as a matter of simple arithmetic." The FQHCs therefore conclude that "[b]ecause an FQHC's . . . per visit wraparound payment is computed by deducting the visit

average from the center's per visit rate, the higher the average of the prior year's average payment, the lower the current year's 'wraparound rate.'"

The evidence in the record suggests that the FQHCs correctly assert that, while they may simultaneously submit a claim to both New York and the MCO for reimbursement, they may not include visits in its MCVR Report for which the MCO has not paid. New York's deposition witness on the subject, Nicholas Cioffi, testified that, contrary to the most natural reading of the Supplemental Payment Program, the FQHC may submit a claim for reimbursement to both New York and the MCO simultaneously. When discussing the MCVR, however, he stated that "[a]ny visits that are not paid by the MCO should be excluded from the report." App'x at 608. This is in keeping with the language of the MCVR, which includes a section for the FQHCs to report the "Number of Visits Paid by MCO[]." App'x at 627.

There is insufficient record evidence to definitively determine whether the Supplemental Payment Program comports with Section 1396a(bb)(5)'s requirement regarding the level of reimbursement due an FQHC, *see* discussion at 21-23, *supra*. While we recognize the strength of the FQHCs' argument, we cannot assess the accuracy of their assertion that the inability to report in the MCVR MCO visits for which the FQHC has not been paid has resulted in New

67

York, either sporadically or systematically, paying the FQHC anything less than a wraparound rate to which it is statutorily entitled. In particular, we cannot find evidence to support the FQHCs' assertion that revenue remains constant in the MCVR, such that the MCVR, by excluding unpaid visits, artificially inflates the average MCO payment-per-visit. Indeed, the MCVR requests information on "MCO[] Payments to FQHC." App'x at 627. Without more, we cannot conclude that the revenue that the FQHC reports is not also on a per visit basis, which means that the information requested for the MCVR would produce an accurate MCO payment-per-visit, and, a fortiori, an accurate calculation of the wraparound payment.

Summary judgment is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, the parties have cross-moved for summary judgment on the issue of whether the prospective calculation of the wraparound payment comports with the requirements of Section 1396a(bb)(5), and we have found, as a general matter, that it does. These motions, however, also require us to consider the subsidiary issue of whether the particular methodology for calculating the prospective wraparound payment also satisfies New York's obligations under Section 1396a(bb)(5). Construing the evidence in the light most

68

favorable to the FQHCs, *Anderson*, 477 U.S. at 255, we cannot conclude, on the basis of the scant guidance for completing the MCVR contained in the Supplemental Payment Program, the text of the MCVR itself, and the deposition of Cioffi, that New York's supplemental payment methodology gives an accurate average estimate of New York's supplemental payment obligation. However, we also cannot conclude that New York's supplemental payment methodology leads New York to systematically underestimate its supplemental wraparound obligation.

To the extent that the district court did not recognize that the clash over this component of New York's supplemental payment methodology was one that turned on a disputed issue of material fact, it committed error. That portion of the order of the district court granting summary judgment to the Commissioner on the question of the compatibility of New York's supplemental payment methodology with the requirements of Section 1396a(bb)(5) must be vacated, and remanded for the limited purpose of resolving, inter alia, what an FQHC must submit in its MCVR Report in order to establish the forthcoming year's supplemental payment rate.

We leave to the district court's sound discretion the procedure that it may wish to employ in order to resolve this dispute. The district court may conclude,

69

for example, that interests of efficiency and judicial economy are best served by reopening the record for the limited purpose of taking evidence on the revenue and visit data that FQHCs must supply in the MCVR Report.

The district court is uniquely positioned to evaluate any submissions on this issue in the first instance for two reasons. First, as with an FQHC's ability to seek a supplemental payment for an MCO encounter even if it has not received payment from an MCO, New York may take the position that the FQHC can report a visit for which it expects, but has not yet received, payment, thus clarifying the language of the Supplemental Payment Program in litigation and effectively mooting the issue, while guaranteeing its payment methodology ensures FQHCs will prospectively receive full supplemental payment. Second, it may be that the scope of the injunctive relief ordered by the district court, which currently provides avenues for FQHC complaints and special rate codes for reimbursement for challenged visits, will have repercussions on the content of the MCVR Report going forward. This may be the case, for example, if such complaints form the basis of "other data sources available to the department" in its validation of an FQHC's MCVR Report. App'x at 620. The relief ordered to remedy New York's paid claim policy will, we expect, need to be harmonized with any relief that the district court might deem necessary to remedy the

70

potential defect in New York's prospective wraparound methodology that we have identified. Any appeal from the district court's decision on remand must proceed on a separate notice of appeal and will be heard by a panel of this Court in the ordinary course.

**CONCLUSION**

The decision of the district court is affirmed in part, and vacated and remanded in part.