Filed 10/16/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| TULARE PEDIATRIC HEALTH CARE CENTER, <br><br> Petitioner and Respondent, <br><br> v. <br><br> STATE DEPARTMENT OF HEALTH CARE SERVICES et al., <br><br> Defendants and Appellants. | B287876 <br><br> (Los Angeles County Super. Ct. No. BS166705) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge. Affirmed.

Xavier Becerra, Attorney General, Julie Weng-Gutierrez, Senior Assistant Attorney General, Richard T. Waldow, Supervising Deputy Attorney General, and Jacquelyn Y. Young, Deputy Attorney General, for Defendants and Appellants.

Foley & Lardner, Erik K. Swanholt, and Adam J. Hepworth for Petitioner and Respondent.

_____

Because California participates in the federal Medicaid program, California must pay federally qualified health centers for their services to Medicaid beneficiaries. (42 U.S.C. § 1396a(bb)(4).) The question is *how much* California must pay the counties and their clinics for providing this care. The answer is "*100 percent*" of the cost of a defined list of services. (42 U.S.C. § 1396a(bb)(4), italics added.)

Tulare County runs Tulare Pediatric Health Care Center ("Tulare Clinic"). The clinic is a federally qualified health center. California's Department of Health Care Services ("the State") refused to pay Tulare Clinic the full amount the *clinic* paid to a contractor. Instead, the State paid Tulare Clinic an amount equal to only the *contractor's* underlying costs. By statute, that was too little.

Tulare Clinic petitioned the court to require the State to pay 100 percent of the amount Tulare Clinic paid the contractor. The trial court rightly granted the petition, so we affirm.

I

We begin with the statutory backdrop, which is extensive. Then we state the facts.

A

Medicaid is a federal program subsidizing state spending on medical care for the poor. (42 U.S.C. § 1396-1; 42 C.F.R. § 430.0.) To get Medicaid funds, states must agree with the federal government to spend the funds in accord with federally imposed conditions. (42 C.F.R. § 430.10; see also *Armstrong v. Exceptional Child Center, Inc.* (2015) 135 S.Ct. 1378, 1382.) And states must match federal dollars with their own, at a rate set by Congress. (42 U.S.C. §§ 1396a, 1396b.)

Federal regulations require each participating state to adopt a "State plan" outlining how it will follow federal Medicaid rules. (42 C.F.R. § 430.10 et seq.) States develop standards to determine who qualifies for medical assistance under their State plan. (42 U.S.C. § 1396a(17).)

Medicaid beneficiaries are people getting medical assistance under a State plan.

Alongside Medicaid, a similar but independent federal program subsidizes healthcare by awarding grants to federally qualified health centers. This is under the aegis of the Public Health Services Act. (42 U.S.C. § 254b.) Health centers like Tulare Clinic qualify for grants by providing primary health services — immunizations, prenatal care, and the like — to medically underserved communities. (42 U.S.C. § 254b.) Some in these underserved communities are also Medicaid beneficiaries. (See *Community Health Care Association of New York v. Shah* (2d Cir. 2014) 770 F.3d 129, 136 (*Community Health*).)

When Congress authorized grants for health centers under the Public Health Services Act, it expected states to reimburse centers for all or part of centers' cost of treating Medicaid beneficiaries. (See Pub.L. No. 94–63, § 330 (July 29, 1975) 89 Stat. 304; *Community Health, supra,* 770 F.3d at p. 136 [the grant program for health centers was established in 1975 as Section 330 of the Public Health Services Act, now codified at 42 U.S.C. § 254b].) Congress heard testimony that, on average, states' payments covered less than 70 percent of the centers' cost of treating Medicaid beneficiaries. (H.R.Rep. No. 101-247, 1st Sess., p. 392 (1989), reprinted in 1989 U.S. Code Cong. & Admin. News, p. 2118; see also *Community Health, supra,* 770 F.3d at p. 136.)

Congress was concerned that, because Medicaid fell short of covering the full cost of treating its own beneficiaries, health centers would use Public Health Services Act grants to subsidize treatment of Medicaid patients. (H.R.Rep. No. 101-247, 1st Sess., pp. 392–393 (1989), reprinted in 1989 U.S. Code Cong. & Admin. News, pp. 2118–2119.) This practice compromised centers' ability to care for those without any public or private coverage whatsoever, who were the very people Congress sought to help when it passed the Public Health Services Act. (See *ibid*.) So Congress amended Medicaid rules to require states to pay health centers 100 percent of their costs for a defined list of services. (H.R.Rep. No. 101-247, 1st Sess., p. 393 (1989), reprinted in 1989 U.S. Code Cong. & Admin. News, p. 2119; see also *Three Lower Counties Community Health Services, Inc. v. Maryland* (4th Cir. 2007) 498 F.3d 294, 297–298 (*Three Lower Counties*).)

This situation has created a complex payment structure: one funding source is a *combination* of federal and state funding, while another is *solely* federal. That is, a combination of federal and state funds support care for patients who are Medicaid beneficiaries. But federal funds alone support care for patients without any health coverage, because those monies come from Public Health Services Act grants, which are strictly federal in origin. (See *Alameda Health System v. Centers for Medicare & Medicaid Services* (N.D.Cal. 2017) 287 F.Supp.3d 896, 902.)

This scheme continues to the present day, with a modification for administrative purposes. The modification was in 2000, when Congress adopted a "prospective payment system" to relieve health centers from the burden of providing new cost data every year. (*Three Lower Counties*, *supra*, 498 F.3d at p. 298.) Under this new system, health centers that become

federally qualified after 2000, including Tulare Clinic, receive Medicaid payment equal to "100 percent of the costs of furnishing [defined] services" during their first year. (42 U.S.C. § 1396a(bb)(4).) In later years, payment is increased by a set percentage and is adjusted only to account for changes in the scope of the centers' services. (42 U.S.C. § 1396a(bb)(3).)

Federal law gives states different ways of determining "100 percent of the costs of furnishing [defined] services" in the initial year. One option — the one pertinent here — is to determine the costs according to "the regulations and methodology" for centers federally qualified before 2000. (42 U.S.C. § 1396a(bb)(4).) That method requires states to pay "an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center . . . of furnishing such services during fiscal years 1999 and 2000 which are reasonable and related to the cost of furnishing such services." (42 U.S.C. § 1396a(bb)(2).)

California incorporated these rules into its Medicaid program, which is Medi-Cal. (Welf. & Inst. Code, §§ 14063, 14132.100, subd. (i)(3).) The Department of Health Care Services administers Medi-Cal and audits payments to health centers. (Welf. & Inst. Code, §§ 14100.1, 14170, subd. (a)(1).)

B

Here are some facts.

Tulare County operates Tulare Clinic, which is a federally qualified health center. Tulare County staffed the clinic by contracting with Dr. Prem Kamboj, who agreed to provide necessary personnel to run the clinic. Tulare agreed to pay Kamboj $106 per patient visit, whether it was Kamboj personally or some other individual who provided the care.

5

In 2011, Tulare Clinic submitted a cost report to the State. The purpose was to set the clinic's rate under the prospective payment system. Tulare Clinic incorporated Kamboj's fee of $106 per patient visit. The clinic then added up its other costs, like office and printing supplies and so forth, and calculated its total cost to be $167.85 per patient visit.

This $167.85 rate apparently was a bargain. The preceding rate had been $226 per patient visit. Tulare County previously ran a different health center that provided the same services as Tulare Clinic, but it cost 35% more than Tulare Clinic's cost per patient visit. At oral argument all counsel embraced this fact. The State's lawyer admitted this fact placed Tulare County in a "sympathetic" light, presumably because the county's actions seemed like good government at work.

Even though Tulare County's new arrangement seemed to be a more efficient arrangement than its old system, the State audited Tulare Clinic's 2009 to 2010 fiscal year expenses. No one disputes Tulare Clinic indeed paid Kamboj $106 per patient visit. But the State did not accept what Tulare Clinic actually *paid* as Tulare Clinic's actual *cost*. Instead, it demanded Kamboj's records so it could determine *his* costs. This is akin to demanding cost records from the subcontractor water company that resupplies the clinic's water cooler.

The State's auditor concluded, in some instances, Kamboj's costs were less than $106 per visit. Apparently, the State's reasoning was the Kamboj's costs *had* to be less, because "the doctor is providing more than just one-on-one professional services to patients. He's providing his staff. He's providing his medical assistants . . . , doctors from his private practice, and, of course, the contract doesn't say that, but he's providing any

specialists and physicians to the clinic, and he's charging a hundred and six dollars per visit to the County."

In other instances, the State faulted Kamboj because he could not support his cost claims with documentation.

As a result, the State made seven audit adjustments that reduced Tulare Clinic's cost of "Physician Services Under Agreement" from $2,308,058 to $1,696,095. These adjustments, and others not on appeal, reduced California's payment rate to Tulare Clinic to $120.98 per patient visit.

Tulare Clinic petitioned the trial court to require the State to set aside the adjustments to the clinic's costs and to recalculate its payment rate accordingly. The trial court granted the petition, finding 42 United States Code section 1396a(bb) required the State to accept the Tulare Clinic's cost of paying Kamboj $106 per patient visit.

## II

The trial court correctly determined the State must accept Tulare Clinic's cost of paying Kamboj $106 per patient visit.

## A

First we review the standard of review. On this appeal, the question is whether the State has proceeded as required by a federal Medicaid statute, state Medi-Cal statute, and state regulation mandating implementation of California's State plan. No facts are disputed; the question is solely one of statutory interpretation. Thus, we independently review the trial court's decision. (*Cassidy v. California Bd. of Accountancy* (2013) 220 Cal.App.4th 620, 627.)

We do not defer to the *State's* interpretation of the *federal* statute at issue: 42 United States Code section 1396a(bb), which we will call subdivision (bb). (*Orthopaedic Hospital v. Belshe* (9th

7

Cir. 1997) 103 F.3d 1491, 1495 [state agencies' interpretation of federal statutes get no deference].)

The State contests this point. It wants deference. It notes the Centers for Medicare and Medicaid Services, a federal agency entitled to deference in interpreting federal Medicaid law, has approved California's State plan, which implements subdivision (bb). (*Community Health Center v. Wilson-Coker* (2d Cir. 2002) 311 F.3d 132, 137–138 [explaining the deference owed to the Centers for Medicare and Medicaid Services].) Therefore, according to the State, by "approv[ing] of California's interpretation and application of" subdivision (bb), the federal agency has somehow imbued the State with the deference owed to the Centers.

This argument fails. The federal Centers may have approved the State plan as a general matter, but there is no sign it approved the State's application of the State plan to Tulare Clinic, or even the State's application of the State plan in similar situations.

We do not defer to the State's interpretation of state law because we do not defer to agency interpretations that are clearly erroneous, as the State's interpretation is here. (*Bonnell v. Medical Bd.* (2003) 31 Cal.4th 1255, 1265.)

We thus independently review this question of statutory interpretation.

B

Now we decide the merits: federal law requires the State pay Tulare Clinic 100 percent of the $106-per-patient-visit sum that Tulare Clinic paid Kamboj. In other words, the State must make Tulare County whole on this score. California's Medi-Cal statute is consistent with this federal requirement.

8

The plain language of subdivision (bb) requires states to pay centers' full cost. It provides, "In any case in which an entity first qualifies as a Federally-qualified health center . . . after fiscal year 2000, the State plan shall provide for payment for services . . . furnished by the center . . . that is equal to 100 percent of the costs of furnishing such services." (42 U.S.C. § 1396a(bb)(4).) The method for determining 100 percent of the costs at issue requires states to pay "an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center . . . of furnishing such services . . . which are reasonable and related to the cost of furnishing such services." (42 U.S.C. § 1396a(bb)(2).) The statute is clear: the State must pay 100 percent of the center's costs for the defined services. We effectuate this plain meaning. (*Bonnell v. Medical Bd.*, *supra*, 31 Cal.4th at p. 1261.)

Instead of adhering to subdivision (bb), the State tries to do exactly what Congress sought to avoid: pay a health center less than the center's full cost of treating Medicaid beneficiaries, creating a risk this clinic will use Public Health Services Act grant funds to subsidize Medicaid beneficiaries. (See H.R.Rep. No. 101-247, 1st Sess., pp. 392–393 (1989), reprinted in 1989 U.S. Code Cong. & Admin. News, pp. 2118–2119.) Due to this problem, Congress changed the law to include the 100-percent-of-costs requirement. The State cannot shirk its responsibility to pay health centers' full costs.

State law is in accord. The Welfare and Institutions Code allows the State to establish a payment rate for new health centers "that is equal to 100 percent of the projected allowable costs to the [federally qualified health center] of furnishing [the health center's] services during the first 12 months of operation. .

9

. . The projected allowable costs for the first 12 months shall be cost settled and the prospective payment reimbursement rate shall be adjusted based on actual and allowable cost per visit." (Welf. & Inst. Code, § 14132.100, subd. (i)(3)(C).)  Like subdivision (bb), the Welfare and Institutions Code creates a clear mandate to pay health centers their full costs.

C

The State defends its adjustments on the ground that subdivision (bb) requires costs to be "reasonable."  (42 U.S.C. § 1396a(bb)(2).)  This defense fails.  The authorities relied on by the State either do not support its narrow understanding of "reasonable," or they do not apply at all.

At the core of the State's argument is California's State plan.  The State uses the State plan as the first link in a chain of authorities, which the State claims supports its interpretation of "reasonable."

The State's argument proceeds in several steps.  First, the State contends the State plan requires it to determine the reasonableness of costs according to the principles in 42 Code of Federal Regulations part 413 ("part 413")—a federal regulation of *Medicare*, not *Medicaid*.  Medicare is a federal program that subsidizes health insurance for the elderly and disabled.  (42 U.S.C. § 1395c.)  Next, the State argues part 413 incorporates 42 Code of Federal Regulations parts 405 and 415, also Medicare regulations.  The State says 42 Code of Federal Regulations part 415, in turn, requires application of the Centers for Medicare and Medicaid Services' Medicare Provider Reimbursement Manual.  Finally, the State contends the Medicare Provider Reimbursement Manual limits costs to "the contractor's [that is,

10

Kamboj's] reasonable costs, rather than the payments made by" Tulare Clinic.

There are three fatal problems with this argument.

The first fatal problem with the State's argument is that the record does not include California's State plan. The Tables of Authorities in the State's briefs do not mention the State plan. When the State quotes the State plan, it cites a portion of the trial court's opinion that quotes the plan rather than the plan itself. Neither party addresses which version of the State plan controls. There is a version of the State plan on the State's website, but it is unclear if it is the relevant version.

The trial court said the "parties agree that California's May 1, 2006 'State Plan Amendment Prospective Payment Reimbursement' is the operative '[S]tate plan,'" and then immediately quotes from the State plan's Attachment 4.19-B. The first page of Attachment 4.19-B accessible from the State's website shows an approval date of May 1, 2006. (Department of Health Care Services, State Plan Amendment – Prospective Payment Reimbursement, Attachment 4.19(B) <https://www.dhcs.ca.gov/formsandpubs/laws/Documents/4.19B_6 -6V.pdf> [as of Oct. 2, 2019], archived at <https://perma.cc/23GS-UKMD>.) But other pages have different approval dates; notably, the page containing the section quoted by the trial court shows an approval date of February 28, 2012. (*Ibid.*) Even if we assumed the trial court quoted the plan correctly, we would still have no understanding of the quoted portions' surrounding context. Because the State plan is not in the record, and because the parties provide no guidance on how we can locate the relevant version, we cannot properly consider the State's argument. (*Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107,

122–123 [appellants have the burden of preparing a record showing trial court error, and courts reject arguments unsupported by an adequate record].)

The second fatal problem with the State's argument is ambiguity about whether the portion of the State plan quoted by the trial court applies to health centers, like Tulare Clinic, that became federally qualified after 2000.  The trial court quotes Attachment 4.19-B, Paragraph D.2.(a) of the State plan, which apparently provides, "Beginning on January 1, 2001, the prospective payment reimbursement rate for [a federally qualified health center] was equal to 100 percent of the average reported cost-based reimbursement rate per visit for fiscal years 1999 and 2000 for the [federally qualified health center], as determined in accordance with cost reimbursement principles for allowable costs explained in 42 C.F.R. Part 413, as well as Generally Accepted Accounting Principles."  (*Tulare Pediatric Health Care Center v. Cal. Dept. of Health Care Services* (Super. Ct. L.A. County, 2018, No. BS166705) at p. 6 [quoting the State Medicaid Plan, Attachment 4.19-B, Paragraph D.2.(a)].)  On its face, this provision simply appears to describe how costs were determined in the past.  A description of past practice would not seem to govern the present controversy.

Still, there is some reason to believe the principles in part 413 should be used to determine the reasonableness of costs for new centers.  The trial court quoted other language from the State plan that suggests the method of Paragraph D.2.(a) should be applied to all centers.  Other Medi-Cal rules reference reasonable cost principles set forth in part 413, suggesting the Medi-Cal scheme generally intends to incorporate those regulations.  (See, e.g., Welf. & Inst. Code, § 14132.100, subd.

12

(e)(1) [providing that, if a health center applies for a rate change based on a change in its scope of services, the rate change "shall be evaluated in accordance with Medicare reasonable cost principles, as set forth in Part 413."].) And Tulare Clinic concedes the applicability of part 413 on appeal.

Yet even if we accept that part 413 applies, we encounter the third fatal problem with the State's argument: part 413 undermines rather than supports the State's position. For instance, part 413 includes the principle that Medicare should pay enough to cover the costs of its own beneficiaries, but not so much that it covers the cost of those who are not beneficiaries. (42 C.F.R. § 413.5(a).) This principle echoes Congress's mandate that states must fully reimburse health centers for the cost of Medicaid beneficiaries. The State violates this mandate by failing to pay Tulare County the full $106 the County pays to Kamboj for each patient visit.

The State highlights part 413's focus on actual costs: the part provides reasonable cost is "cost actually incurred, to the extent that cost is necessary for the efficient delivery of the service," and "actual costs of providing quality care." (42 C.F.R. §§ 413.13, 413.9.) Similarly, the approach outlined in part 413 should "result in meeting *actual costs* of services to beneficiaries as such costs vary from institution to institution." (42 C.F.R. § 413.5; italics added.) These provisions also cut against the State. The actual cost incurred by Tulare Clinic was the $106 per patient visit paid to Kamboj.

Part 413 uses broad and inclusive phrases when outlining reasonable costs. It requires payment of "[a]ll necessary and proper expenses of an institution in the production of services." (42 C.F.R. § 413.5.) It later defines "[n]ecessary and proper costs"

13

as "costs that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities." (42 C.F.R. § 413.9(b)(2).) This broad wording also favors paying Tulare Clinic the full $106 per patient visit that Tulare Clinic paid to Kamboj.

There is only one narrow exception where part 413 directs payment based on the costs of a contractor rather than the costs of a provider. (42 C.F.R. § 413.17.) That exception is when the provider and contractor are related by common ownership or control. (42 C.F.R. § 413.17.) This exception makes sense because, when parties are related, the amount a provider pays a contractor may reflect internal accounting or non-pecuniary considerations rather than the value of a service. But when a provider and contractor are not related, the amount a provider pays a contractor presumably represents the amount the provider had to pay to induce the contractor to provide services.

The related party rule of part 413 does not apply here. On an audit adjustment not at issue on this appeal, the administrative law judge found Tulare Clinic and Kamboj were not related. The State did not challenge that finding at the trial court, nor does it challenge the finding on appeal. Tulare Clinic discusses the related party rule at length in its briefing. The State does not even attempt to reply.

The exception does not apply. The general rule does: part 413 directs payment based on the costs of a provider rather than the costs of a contractor. The State must pay 100 percent of the $106 sum that Tulare County paid.

The State's alternative theory, which we reject, suggests the State can reduce payment to a center based solely on the ground that the center pays a contractor more than the

14

contractor's underlying expenses.  Under this theory, the State might acknowledge that Tulare Clinic actually paid Joe's Photocopier Rental Place $50 per month to rent the photocopier. But the State would want to see Joe's records to see how much Joe was paying for the machine.  This approach would prevent centers from ever hiring contractors.  And, in many cases, it may be more efficient for a center to hire a contractor to provide some services, like water delivery or photocopying, than for the center to do that work itself.  This is true even when the contractor turns a profit, as every successful business must.

The State notes 42 Code of Federal Regulations part 413.9 provides, "Reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used, and the items to be included."  (42 C.F.R. § 413.9(b)(1).)  The State uses this sentence as a vehicle to attempt to bring in every other Medicare rule that might favor its case.  It claims the sentence justifies reference to 42 Code of Federal Regulations parts 405 and 415, and 42 Code of Federal Regulations part 415 requires application of the Medicare Provider Reimbursement Manual.

The State plan's reference to part 413 does not allow the State to apply any Medicare regulation it sees fit.  If the drafters of the State plan intended reasonable costs to be determined according to *all* Medicare regulations, it would have said so. Instead, those drafters specified part 413.

The State cites *Oroville Hospital v. Dept. of Health Services* (2006) 146 Cal.App.4th 468 (*Oroville Hospital*) for the proposition that allowable costs are determined in accordance with Medicare standards and the Medicare Provider Reimbursement Manual. But *Oroville Hospital* involved a hospital and a regulation that

15

expressly applies Medicare standards and the Provider Reimbursement Manual to hospital inpatient services. (*Id.* at p. 492; Cal. Code Regs., tit. 22, § 51536.) That regulation does not appear to apply to federally qualified health centers. (Cal. Code Regs., tit. 22, § 51536.)

The State warns that we risk creating "an untenable situation where 'reasonable costs' are determined by the provider and only the provider because the provider is the entity that contracts with other medical professionals." According to the State, the result will be excessive contractor costs, courtesy of taxpayer dollars. Not so.

First, on this record the contract between Kamboj and Tulare Clinic was an arms-length deal. When health centers bargain with contractors, they will likely negotiate vigorously to keep their costs down. That will limit contractor payment to the minimum necessary to get the contractors' services. As we already have noted, Tulare Clinic is charging Tulare County 35 percent less than its predecessor. Both Tulare County and Tulare Clinic has incentives to economize, and this incentive structure seems to be working. The State's fear of excessive contractor costs seems unfounded here.

Second, the State has ample ways to attack health center costs that indeed are unreasonable. Our decision in this case does not change that. But the State cannot reduce payment based on regulations that do not apply, with no other showing of unreasonableness. That is what the State seeks to do here.

Congress recognized states tend to shortchange health centers. That tendency means some health centers are forced to subsidize Medicaid beneficiaries with unrelated grant money. Other health centers, denied full funding, may simply close and

16

leave underserved communities without affordable care. Congress's remedy was to require states to pay "100 percent" of centers' costs for a defined list of services. (42 U.S.C. § 1396a(bb)(4).) The State must comply with Congress's mandate.

## DISPOSITION

The judgment is affirmed. Costs to Tulare Clinic.


WILEY, J.

WE CONCUR:


BIGELOW, P. J.


GRIMES, J.

17